De Reeder et al., Appellants, *v.* Travelers Insurance Company.

Argued January 12, 1938. Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN and STERN, JJ.

*Clarence G. Myers,* with him *Duane, Morris & Heck-
scher,* for appellants.

*Richardson Dilworth,* with him *Evans, Bayard &
Frick,* for appellee.

OPINION BY MR. JUSTICE MAXEY, March 21, 1938:

This was an action to recover the sum of $5,000 for
the accidental drowning of the insured, Sadie Helen
Ancker, upon a policy issued by defendant company pro-
viding for the payment of this amount for death occur-
ring "from bodily injuries effected during the term of

the insurance directly or independently of all other causes through external, violent and accidental means."

Mrs. Ancker, aged 68, weighing about 156 pounds and 5 feet, 7 inches tall, took passage on the steamer "Fairfax" at Miami, Florida, on January 2, 1934, for Baltimore, Maryland. On the evening of January 4th she had dinner in the main dining room, played bridge a short time with fellow passengers, and, upon becoming slightly seasick, was assisted to bed about 8 p. m. that evening by the ship's nurse. She was sleeping peacefully when the nurse looked in on her again at 10 p. m. The ship was then at least thirteen miles off shore and was never closer to shore until it stopped two days later at Norfolk. When the nurse called at her cabin at 8 a. m. the next morning Mrs. Ancker was not there. She had been last seen at 10 p. m., January 4th. No trace of her has since been found.

Plaintiffs contended that Mrs. Ancker "lost her life at sea by accidental drowning" by falling overboard, either while walking along the deck or while leaning over the rail on account of sea-sickness. It was testified that Mrs. Ancker occupied a stateroom whose only access was from an outer promenade deck, six feet wide, guarded by a rail three feet five inches high, made of pipelines from the top of the rail to the bottom of the deck, and that for toilet facilities she had to go out on the deck, walk forward approximately twenty feet to the door of the public hall, from which she could reach the ladies' toilet room, and that this twenty feet of deck was on the lee side of the ship and completely covered by roofing. The night on which she disappeared was described by one witness, called in behalf of plaintiff, as rainy, "rough" and "wet." On cross-examination this same witness when asked, "It was not an unusually rough night that night, was it?" answered, "Oh, no, sir." Another witness testified that "a storm was coming up, for the clouds were gathering, and I felt that the motion of the boat was increasing. . . . There was a pitch

and some roll" of the boat. Mrs. Ancker's daughter testified that it was her mother's habit to get up several times during the night to visit the toilet. She also testified that the last time she saw her mother (September, 1933), the latter's health was "quite good." On the evening in question, Mrs. Ancker's health was described by one witness as "very good, very normal, . . . jolly in her attitude." Another witness said he "would say she was in good health." Dorothy R. Mannix, the ship's nurse, testified that on the evening of January 4th, Mrs. Ancker was not suffering from anything except seasickness and that "she was not very seasick, just a little. . . . She was not sick enough for any treatment at all; but I took her to her room and undressed her and put her to bed, and made her comfortable, as well as I could. . . . I went back at ten o'clock. . . . She was apparently sleeping soundly and looked perfectly comfortable, with a warming pad on her" which the nurse had connected when she put her to bed. The nurse said further that when she went to Mrs. Ancker's cabin at 8 a. m., the next morning the cabin door was unlocked and that she was not there, that the electric heating pad was still plugged in, and that the only things missing were her nightgown and undershirt which the nurse had put on her the night before. Mrs. Ancker's daughter testified that "I know whenever mother went on a sea voyage she would get seasick. We used to tease her about it, but she loved traveling and kept going on just the same. She said it was worth it." The daughter also said that her mother slept "very restlessly, always."

Captain Archie Henry Brooks of the "Fairfax" testified that the notations in his log showed the following weather conditions on the night of January 4th and early morning of January 5th: rain from 6:06 p. m. until 8 p. m.; clear at midnight, and at 4 a. m. (January 5th), rain. He said that if it was raining during the evening the promenade deck outside the cabin which Mrs. Ancker occupied "would be wet." He testified that

he had a complete search made of the ship for Mrs. Ancker and that at the conclusion of the search he "notified all the coast guard and all vessels to keep a lookout for a lady who was missing from the ship." He said that her cabin "was in perfect order. The bed had been used, I could see; but her clothing and bags and suitcase were in perfect order. I saw nothing disturbed. . . . I saw her purse," which contained "some pieces of jewelry and various papers and envelopes." On cross-examination he was asked the following questions and gave the following answers: "Q. Unless a person was deliberately leaning way over the rail, that is, if a person was walking down the deck, and was for any reason thrown against that rail, it would not have been possible for them to fall overboard? A. Not from them being thrown against it. Q. So that the only time they could fall overboard, with the kind of night it was and the weather that night, is if they were leaning well out over the rail? A. I would say so. Q. The rail is also so designed that no one could fall overboard between the top of the rail and the level of the deck? A. Absolutely not." He further testified that during the night in question there were two men on watch, "going the entire round of the deck," that one of the two would ordinarily pass Mrs. Ancker's cabin at least every fifteen minutes, and that both men told him that they had not seen her during their rounds.

Defendant offered no testimony and contends that "a finding of death by suicide would have been at least as reasonable as a finding of death by external, violent and accidental means." This contention is based chiefly on testimony of plaintiff's witnesses adduced on cross-examination, to the effect that Mrs. Ancker had asked the Chief Steward of the boat how far off shore the boat would be at various points along the coast; that she opened her purse and showed him many trinkets and other things she got from various parts of the country, together with a paper dated December 28, 1932, that

contained her "address in case of accident"; and that she had checked a package with him giving both her own and her daughter's name. The paper containing "her address in case of accident" also gave the following instructions: "My remains are to be cremated, ashes put in a pasteboard box, given to the American or other reliable express company to be scattered on the nearest ocean fifty miles from shore. . . ." It was also brought out that her husband had died in Charleston, S. C., which the boat passed the night that Mrs. Ancker was lost. Mrs. Ancker's daughter was asked questions on cross-examination which were designed to show financial stringency as a motive for suicide; that Mrs. Ancker's income had been cut, and that her real estate had little value.

The court below charged the jury that the issue was not whether the insured died accidentally or committed suicide, but that the issue was between accidental death and all other possible forms of death including heart disease or apoplexy while leaning over the rail.

The jury brought in a verdict for defendant. Plaintiffs' motion for a new trial was refused and judgment was entered for defendant on the verdict. This appeal followed.

Plaintiffs' case fell because of failure of proof. There were no facts or circumstances from which the jury could infer legitimately *to the exclusion of other inferences equally plausible* that the insured's death resulted from an accident. The burden of proof resting upon plaintiffs in civil actions cannot be met by conjectures. The phrase "burden of proof" means exactly what it says. There is a close relationship in logic between the quality of proof required in criminal cases and that required in civil cases. The difference is in the degree of its cogency. In *both* classes of cases *proof* is required of the party on whom is the burden of establishing the truth of the basic proposition essential to recovery. Mere conjecture or guesses do not supply this proof.

Circumstantial evidence is legal evidence in both classes of cases, but just as in a *criminal* case "the evidence of facts and circumstances must be such as to exclude to a moral certainty, every hypothesis but that of guilt of the offense imputed" *(Com. v. Benz,* 318 Pa. 465, 472, 178 A. 390), so in a *civil* case the evidence of facts and circumstances on which plaintiff relies and the inferences logically deducible therefrom, must so preponderate in favor of the basic proposition he is seeking to establish as to exclude any equally well supported belief in any inconsistent proposition.

In the instant case, there is fully as much reason to believe that the insured did *not* meet with an accidental death as that she did. If in cases of this kind the "scales" equally balance between the theory of accidental death and nonaccidental death, the verdict must be for the defendant. We said in *Watkins v. Prudential Ins. Co.,* 315 Pa. 497, 512, 173 A. 644: "On plaintiff rests the burden of proving all the operative facts by a fair preponderance of the evidence. An even balancing of the evidence on the issue of death by accidental means or death by suicide denotes that plaintiff fails to sustain her burden of proof and the verdict should be for the defendant." We also said in that case: "The so-called 'presumption against suicide' [cannot be given] the weight of a probative fact, thereby casting upon the defendant the burden of proving that the insured's death was something other than the kind of death insured against. Considerable confusion appears in judicial opinions as to the nature of presumptions and their function in the administration of justice. They are not evidence and should not be substituted for evidence."

In the case now before us, the only fact established by the evidence is that Mrs. Ancker disappeared from the ship on which she was a passenger. The cause of her disappearance is pure conjecture, and as to that cause the oft-used phrase, "one guess is as good as an-

other," can appropriately be applied. The plaintiffs having pleaded the insured's death by "external, violent and accidental means" had to prove it in order to recover.

The basic complaint of the appellants is the following instructions of the trial judge: "I want to make very clear to you, and this is where I differ radically from counsel who have argued this case, that the issue before you is not merely whether this woman died accidentally, or whether she committed suicide. That is not the issue. . . . The issue is between accidental death and all other possible forms of death; and your verdict for the defendant would not be a verdict that suicide had been committed, it would merely be a verdict that in your opinion the plaintiffs have not sustained their burden to prove that the death was accidental." This is a clear statement and one that was the trial judge's duty to make.

Appellants say in their argument: "It is submitted that the issue in this case was that made out by counsel for plaintiffs and defendant in the trial of the case, and not as laid down by the court in its charge to the jury." The answer to this is that the issue in any case is not "made out" by the respective counsel in the trial of the case. The issue is made out by the pleadings, under the law. The plaintiffs having *pleaded* that the insured lost her life by *accidental* drowning and the defendant having adequately *denied* this averment, *that* made the issue. It was not incumbent upon the defendant to prove that the insured committed suicide or died of a stroke or of a heart attack. Defendant offered no evidence whatsoever but maintained that plaintiffs had failed to sustain the burden of proof. The jury accepted this view. The court might justifiably have done so by affirming defendant's request for binding instructions.

The following cases cited by appellants are inapplicable: *Pomorskie v. Prudential Ins. Co.*, 318 Pa. 185,

177 A. 783, and *Wainstein v. Equitable Life Assurance Assn.*, 318 Pa. 428, 178 A. 502. In these two cases the issue of accidental death was submitted to the jury and the latter found in favor of the plaintiffs. Defendants appealed on the ground that the court should have granted binding instructions. These were "border-line cases" and we refused to reverse the action of the court below. In the case at bar the defendant is not appealing; plaintiffs are appealing because the jury found against them. Their chief complaint is that the court erred in telling the jury precisely what the issue in the case was. Instead of this being error, it was proper and commendable. "It is a primary duty of the trial judge —a duty that must never be ignored—in charging a jury to clarify the issues so that the jury may comprehend the questions they are to decide": *Sears v. Birbeck*, 321 Pa. 375, 184 A. 6.

In the case of *Walters v. Western & Southern Life Ins. Co.*, 113 Pa. Super. Ct. 221, also cited by appellants, the issue whether plaintiff's husband died from accidental means was submitted to the jury. The trial judge held that there was evidence from which accidental death might be inferred. The jury found in favor of the plaintiff and the defendant appealed on the ground that binding instructions should have been given. The case of *Harvey v. Fidelity & Casualty Co.*, 200 Fed. 925, cited by appellant, did not decide the issue raised in this case. In that case the court held that the action was barred by limitations of time in the policy. The court in its opinion said: "Death, like any other fact, may be proved by circumstantial evidence alone. . . . No legal excuse or justification is shown for plaintiff's long delay in commencing suit, and the trial judge did not err in directing a verdict for defendant."

There were no errors in the trial of this case. The verdict was in accordance with the law and the facts.

The judgment is affirmed.