Sankey, Appellant, *v.* Young.

Argued March 24, 1952.    Before Drew, C. J.,
Stearne, Jones, Bell, Chidsey and Musmanno, JJ.

*Lee C. McCandless,* with him *Roger B. Johnson,* for appellant.

*John L. Wilson,* for appellee.

OPINION BY MR. CHIEF JUSTICE DREW, April 22, 1952:

The accident giving rise to this suit in trespass occurred during the reconstruction of Route 422 in Butler County when Paul Lee Sankey, an employe of the construction company was struck and killed by a truck owned and operated by James Russell Young. John C. Sankey, administrator of Paul Sankey's estate, brought this action against Young under the Wrongful Death Act and the Survival Act. At the trial the jury returned a verdict that both defendant and Sankey were guilty of negligence. A motion for new trial was dismissed and judgment was entered for defendant.

The new road known as State Highway Route 422 was to be a three-lane concrete highway. On July 6, 1949, the date of the accident, one outside lane had been completed and the center lane was being laid. To facilitate this process a "batch plant" was set up some distance from the place of operation and there the dry concrete was made according to formula. Some ten to twenty trucks, among them defendant's, were employed to haul the dry concrete from the batch plant to the mixer where it was mixed and poured onto the road bed. To assure constant production the dry concrete had to be delivered to the mixer at a rate of one truck load every minute and a half. The mixer was set up in the third lane which had been rough graded but not finished. The trucks would drive up that lane, turn around and back up to the mixer. Because of the necessity for rapid delivery several trucks were usually in line awaiting their turn to deliver to the mixer.

On the morning of the accident a spreader had broken down and was pushed to a point in the center lane about seventy-five feet in front of the construction work. 'A projection on the spreader extended twenty-six inches into the lane used by the trucks and on that projection was placed a can of water. At about 10:30 A.M., Sankey and several other workmen had gone to the water can for a drink. At that time, defendant's truck was stopped with its motor running fifteen to twenty feet beyond the water can and in a position to back past it in going toward the mixer. Sankey stood to the rear of defendant's truck and looking away from it. Someone called out that a truck was overturning near the mixer. Sankey took two steps toward the mixer when he was struck by defendant's truck which had at the same time begun backing up. The injuries caused by the accident resulted in Sankey's death a few minutes later.

On these facts defendant's negligence is not and could not be questioned. The jury properly found that in backing his truck without giving warning or ascertaining that no one was behind him, he failed to exercise reasonable care: *Potter Title and Trust Co. v. Young*, 367 Pa. 239, 80 A. 2d 76; *Caulton v. Eyre & Co., Inc.*, 330 Pa. 385, 119 A. 136. It is plaintiff's contention, however, that defendant was guilty of wanton misconduct and the trial judge erred in failing to instruct the jury on that subject. To accept such an argument would be to ignore the basic and fundamental distinction between negligence and wantonness.

"Negligence consists of inattention or inadvertence, whereas wantonness exists where the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong.": *Kasano-*

*vich v. George,* 348 Pa. 199, 203, 34 A. 2d 523. In the present case defendant could not see directly to the rear of the truck because of the construction of the body. He should under those circumstances have given some warning so that any person who might have been behind the truck could have gotten out of its path. His failure to do so was negligence, but negligence, however gross, is not wantonness: *Turek v. Pennsylvania R. R. Co.,* 369 Pa. 341. There is no evidence that defendant knew Sankey was in a position of danger. Knowledge that a person is in fact in a position of peril or circumstances from which such knowledge can be inferred must be shown before wanton misconduct can be found to exist: *Engle v. Reider,* 366 Pa. 411, 77 A. 2d 621; *Kasanovich v. George,* supra. See also *Tanner v. Pa. Truck Lines, Inc.,* 363 136, 69 A. 2d 366. There being no evidence of wanton misconduct, the trial court properly refused to submit that issue to the jury.

Plaintiff also argues that since Sankey was a workman he could not be held to the same degree of care as a pedestrian. That rule is, however, only applicable where the injured person is actively engaged in his work at the time of the accident. As we said in *Copertino v. Chrobak,* 346 Pa. 49, 51, 29 A. 2d 504: "But this rule does not apply where, at the time of the accident, the workman is at a place where his work does not require him to be, is not actually engaged upon his labors, and the circumstances are such that he is free to take precautions for his own safety."

Here, Sankey had stopped his work to get a drink and was certainly free to take any precautions he believed necessary. He was fully aware of the procedure followed in backing the trucks to the mixer. In fact, one of plaintiff's witnesses testified that he was at the water can at the same time but stood inside the form

for the center lane as a precautionary measure. Under those circumstances the jury was fully justified in finding Sankey guilty of contributory negligence. This is true even though a truck overturned near the mixer. The trial judge instructed the jury that they were to find the facts by careful consideration of all of the evidence and from those facts determine whether Sankey exercised reasonable care under the circumstances. With those instructions in mind it is obvious that the jury believed that the overturning truck was not an occurrence of such a nature that a reasonably prudent man would have been diverted to such an extent that he would have disregarded his own safety.

Under all the evidence we are convinced that the jury reached a proper verdict on a record that is free from harmful error. Accordingly judgment was correctly entered on that verdict.

Judgment affirmed.

***

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Paul Lee Sankey at the age of 25 years was a graduate of Grove City College, a war veteran, and a law student at the Dickinson's School of Law. Apparently a youth of ambition and energy, he worked at various jobs during evening hours and vacation time while attending high school and college. Of a saving disposition, and seeking to lessen the financial burden of his parents, he obtained employment in the summer of 1949 on a state road construction job to help pay for his tuition at law school.

Standing 6 feet 3 inches and weighing 190 pounds, he was well equipped physically for his labors on the construction job which consisted of setting up, adjusting and levelling the steel forms or frames into which was poured the wet concrete in the paving of the highway to be known as State Route No. 422.

The plans for the road construction envisaged high speed production, the laying of the concrete for 11 feet wide slabs proceeding at the rate of 275 to 300 feet per hour. An eight hour day's work was to accomplish the paving of 2250 feet of such slabs, practically a mile. A fleet of some twenty trucks carried the dry concrete ingredients known as "batches" to the concrete mixer or paver, the paver mixed the batch with water, a boom carried the wet mix to the steel frames, a spreading machine known as a "spreader," tamped and spread the compound evenly and then a finishing machine completed the operation.

On the day of the incidents here under discussion the road building had reached a point in Muddy Creek Township, Butler County, moving from east to west with its destination a place called Dixie Inn. Some 90 men were working on the enterprise.

The trucks transporting the batches from the batch plant moved to a point about 100 feet west of the mixer-paver and then backed eastwardly to the machine. As each truck unburdened its batch in to the mixing machine and drove away, another truck backed up, discharged its load and returned to the plant for a fresh supply of batch. The unloading process into the paver was accomplished in 17 to 21 seconds. Every 1½ or 2 minutes a new truck, in reverse position, had moved up to the paving machine. Every hour 70 batches were emptied into the paver.

On July 6, 1949, when Paul Sankey had been on the job about five weeks, a spreader, temporarily disabled, was elevated to one of the forms, and, atop this improvised platform, a five gallon can of drinking water was installed. This watering place, as is true all over the world and in every type of vocation and occupation, became a spot where men gathered if only for the few moments absorbed in waiting for one's turn, drawing the water and swallowing it. The water was

contained in a garbage can (presumably one never used for garbage) with a spigot attached, so that satisfying one's thirst was not merely a matter of an unlingering instant. This gregarious rendezvous at the drinking spot was a fact known to all those engaged on the construction job at that point.

The morning of July 6th began as a very hot day so that interest in the galvanized oasis amid this desert of concrete mounted with the rising temperature. At about 10:30 in the forenoon some seven or eight men were in the immediate vicinity of the water can and four were actually waiting to quench their thirst. About 20 feet away from the drinking place a truck was halted, in position to back to the mixer about 100 feet away. The men were standing between the watering place and the mixer. Paul Sankey had handed to one of his fellow-workmen a package of tobacco and had moved forward to draw himself a draught of water. While still holding the cup in his hand, the truck, without signal of any kind and without warning from the driver, suddenly started backwards, heading for the paver and for the men in its path. The frightened workers scurried to escape. Two were able to avoid the trajectory of the vehicle, but two were struck. The truck, with its batches of concrete, weighed about 12,000 pounds:

Witness William J. Bowser described what happened: "Q. What part of Mr. Young's truck touched you? A. His back end gate hit me on the shoulder. Q. And what side of the end gate with relation to the left or right rear was it? A. The right rear. Q. His right rear? A. Yes. Q. Then I understand you pushed O'Neil and pushed him over toward the forms from the path in which the trucks were backing? A. When I stopped to push Irish out of the way the truck caught up to me and hit me on the shoulder and I started to move again and felt my foot was going to get run over but I wasn't going to let my body get run over. I think I tucked

my feet close to me and when I yelled I saw Paul trying to crawl away on his hands and knees and I was yelling as loud as I could yell. Q. Which direction was he endeavoring to crawl? A. He was trying to crawl to the east. He was crawling toward the mixer, trying to get out of the way. Q. He was crawling the way the truck was backing up? A. He was trying to keep away from the back wheel. Q. How much time elapsed from the time you glanced over your shoulder and saw this truck? A. I couldn't tell you that. It was just one of those things. It happened so fast. Q. It was a very fast operation? A. That's right. I couldn't tell you how fast it was. Q. But it wasn't but an instant after you saw the truck that it got your shoulder and you were down and as you went down you saw Paul down? A. That's right. Q. It happened almost like a flash? A. That's right. Q. The right rear wheel then did pass over Paul, a portion of Paul's body? A. It rolled up over his abdomen here and I thought it was going to run over his stomach and then it stopped." Crushed beneath the wheels, Paul Sankey died within minutes.

From this tragic episode resulted the law suit in Butler County which resulted in a verdict, containing the anomalous wording: "Both parties of this suit negligent in this accident, and it is our recommendation that Mr. James Russell Young reimburse Mr. John C. Sankey $661.80 for burial expenses."

The plaintiff, who was the decedent's administrator, moved for a new trial on the ground of inconsistency in the verdict and trial errors in the court below.

A careful reading of the record impels the conclusion that the strange finding of the jury was due to the inadequate instructions they received from the Court, for it is patent that if both defendants were negligent the plaintiff would not be entitled to reimbursement of the funeral expenses.

The plaintiff charged the truck owner, defendant in this law-suit with certain acts of negligence: failure to observe the presence of Paul Sankey in the path of his truck; failure to make inquiries and observation prior to backing his truck; failure to maintain a proper position in the truck so as to note the trajectory of his travel and persons or obstacles in the way; failure to maintain a mirror which would have revealed conditions behind his truck; failure to have the truck under proper and adequate control; failure to give proper signal or warning of the driver's intention to back the truck; failure to stop the truck after he had struck the decedent, although warned to do so by the impact and by shouts of persons present; operating at an excessive rate of speed in the circumstances; failure to exercise the necessary caution in the circumstances.

Of these specific charges of negligence the trial Judge told the jury not a word. Instead of obtaining a lantern to illuminate the way through their deliberation and consideration of the voluminous evidence, the jury received dark glasses which could only confuse and bewilder.

On the most vital issue in the case, namely, what constituted negligence, the Judge charged merely as follows: ". . . Negligence has been defined to you by both counsel for the Plaintiff and the Defendant as want of care under the circumstances, the doing of something that a reasonably prudent person would not do, the failure to do what a reasonably prudent person would do under the circumstances." Later in the charge he said: ". . . But it is contended by the Plaintiff that this Defendant, Mr. Young, started his truck and ran into Paul Sankey and that in doing it he was negligent. So it has been discussed here quite a good deal and hashed over quite a bit with these witnesses and I am going to leave it with you. Was Mr. Young negligent? Did Paul Sankey do what a reasonably prudent person

would do? Well, it has been stated by counsel here that it is a presumption he did because of a man's love for his life, that he took whatever precaution would be necessary, but I am going to instruct you that, while that is true, as I understand the law it is not a legal presumption and it may be rebutted by the testimony that is introduced in the case and I am going to leave with you the question, was Paul Sankey negligent in any degree, because if Paul Sankey—if Mr. Young was negligent and Paul Sankey was negligent, too, there can be no recovery in this case; and it don't make any difference what the inference of degree is, if Paul Sankey was negligent in any particular, there can be no recovery for the plaintiff in this case."

And the Judge's final words on this all-vital issue of negligence were as follows: ". . . The testimony on the part of the Plaintiff is that Paul Sankey was killed by being run over by the right rear wheels and you will examine these photographs to determine whether Mr. Young was negligent or not. So that if you find that Mr. Young was not negligent, of course there can be no recovery and your verdict should be for the Defendant. If you find that Mr. Young was negligent and Mr. Paul Sankey was negligent in any degree, there can be no recovery and the verdict should be for the Defendant. If you find that Mr. Young was negligent and Paul Sankey was not negligent in any degree, then the verdict should be for the Plaintiff."

Nowhere in the charge does the judge tell the jury, in terms of the physical properties and instrumentalities involved in the accident, just what James Young and Paul Sankey, individually, were required to do or not to do. Was the driver by law obliged to sound a warning before backing up, was it his duty to visually examine the terrain over which he was to move his 12,000-pound vehicle, did the law impose upon him the necessity of travelling at any particular speed if he

could not see what was beyond the end of the truck? On these and other vital matters the Court said nothing except to instruct the jury on the theoretical responsibilities of that mystical personage known in the law as a reasonably prudent person.

The Trial Judge referred to the proposition that a deceased person is presumed to have absolved himself from the charge of contributory negligence because of "a man's love for his life." But he left that proposition dangling in mid-air. It was like telling a jury that there is a certain law in Tibet about polygamy and asking them to pass upon it without saying anything further about it. In illustrating the presumption against contributory negligence on the part of one now deceased, the Court might have touched on Paul Sankey's educational background and his general experience in life. Would he, with that training, have subjected himself to unnecessary appraisable danger? Paul Sankey was at a place where he had the right to be. Did he, under all the circumstances, have the right to expect the truck driver would offer a warning before starting his truck? That was a matter for the jury to decide under instructions from the Court.

In the case of *Kelchner v. Nanticoke Boro,* 209 Pa. 412, 418, 58 A. 851, this Court said: "But the charge was so meagre and inadequate in so far as any definition of the duty required of the defendant under the circumstances was concerned, as to justly subject it to the criticism which was expressed by our Brother MESTREZAT upon the charge of the trial judge in Hays v. Penna. R. R. Co., 195 Pa. 184, where he said: 'It will be observed that the duty of the defendant in regard to keeping the bridge in repair is not defined, nor is there anything in the charge which indicates to the jury what was the measure of defendant's duty in this respect. The court tells the jury that: "If you believe those facts and that without any negligence on her

part, she was injured by reason of the negligence of the railroad, then she would be entitled to recover." The substance and effect of the charge is that if the defendant was guilty of negligence, the plaintiff could recover. Without more, this was insufficient. The jury could not determine whether the defendant was guilty of negligence without knowing the degree of care required of the defendant in keeping the bridge in repair. The absence of this care would constitute the negligence for which the defendant would be responsible. Hence, the court should have instructed the jury clearly and distinctly as to the duty of the defendant in the premises, and the failure to do so was error.' "

The duties of a trial judge in charging a jury were well outlined in the case of *Archer v. Pennsylvania R. R. Co.*, 166 Pa. Superior Ct. 538, 541, 72 A. 2d 609, where Judge RHODES said: "The primary duty of a trial judge in charging a jury is to clarify the issues so that the jury may comprehend the questions they are to decide. De Reeder v. Travelers Insurance Co., 329 Pa. 328, 336, 198 A. 45. If the charge is wholly inadequate or not clear, or has a tendency to mislead and confuse rather than to clarify the issues, a new trial will be granted. Randolph v. Campbell, 360 Pa. 453, 458, 62 A. 2d 60. The functions of a trial judge embrace not only the duty to state to the jury correct principles of law applicable to the pending case and to endeavor to make such principles understandable in plain language, but they also impose upon the judge the duty to assist the jury in applying those principles to the issues presented to them for determination."

It can be said of the charge in the case at bar as was said in the *Archer* case: "The instructions did not give the jury any reasonable guide for determination of the question of appellant's alleged negligence." It can also be said in this case, as was said in the *Archer* case: "The court's instructions on contributory

negligence were so meager as to be of no practical assistance to the jury in deciding this question. The instructions on burden of proof and the duty of coming forward with evidence (Sears v. Birbeck, 321 Pa. 375, 383, 184 A. 6; MacDonald v. Pennsylvania Railroad Co., 348 Pa. 558, 564, 565, 36 A. 2d 492) were also inadequate."

An inadequate charge sends a jury into the quagmire of guesswork, skirting the precipice of irresponsible conjecture. A misleading charge pushes them over that precipice.

Some of the insufficiencies of the charge in the case at bar might have been remedied by plaintiff's points for charge, but the rejection of these points by the Trial Judge not only left the charge still inadequate but it did the additional harm of conveying (even though unintentionally) to the jury the notion that the Judge regarded the plaintiff's assertions as of slight legal consequences.

In *McNees v. Sims*, 231 Pa. 386, 80 A. 866, this Court pointed out that a trial judge commits clear error in declining points submitted for charge on the ground that the instruction prayed for was covered in the general charge where the legal propositions contained in the points were correct, and the answers of the Court gave no clear expression of its views as to the various propositions contained in the several points.

At the conclusion of the charge, plaintiff's counsel asked the Court to instruct the jury as follows: "1. It was the duty of Mr. Young in backing his truck to exercise a high degree of care, and before starting to back to make certain no one was behind it. A driver who backs his motor vehicle any distance when he cannot see what is behind him is inviting injury not only to himself but to others."

This point was taken almost verbatim from the case of *Caulton v. Eyre & Co.*, 330 Pa. 385, 389, 199 A. 136,

where this Court said: "A man who backs a motor vehicle any distance when he cannot see what is behind him and has no one present to tell him what is behind him, is figuratively speaking, taking a 'leap in the dark,' and to take such a leap (as, for example, motor vehicles do when they proceed in a fog), is to invite the injury of one's self or of others . . . ."

The Trial Judge, in refusing point No. 1, said: "We are going to refuse that, and, as I said, we are going to leave the question of his negligence and Paul's negligence for you to decide." The refusal of the point in this language not only in effect told the jury that the law announced therein was wrong, but it contained the additional fault of suggesting that the Court's charge sufficiently covered the subject involved, which unfortunately it did not.

In the *Archer* case, supra, Superior Court Judge RHODES said that the judge's charge there was so inadequate that the jury was "without guide or compass." The inadequacy of the charge in this case was so pronounced that the jury were put to sea on a ship not only without compass but without helmsman, rudder or ballast. It is no wonder that they floundered in the ocean of indecision and finally were wrecked on the rocks of hopeless inconsistency and helpless irresponsibility.

The situation of a backing truck striking a pedestrian is not one unknown in our law books. In *Potter Title & Trust Co. v. Young,* 367 Pa. 239, 80 A. 2d 76, the facts were somewhat similar to the ones at bar except that there the driver testified that he looked before starting backward and saw no one on the road. However, he failed to blow his horn and of course he could not see what was to the rear of the truck except along his own side. The number of features of potential negligence in this case far outnumber those in the *Potter Title & Trust Case,* but this Court affirmed the

verdict for the plaintiff there and said: "The driver of the truck, therefore, was bound to realize the likelihood that not only the operator of the grader but other persons also might be standing at or near the grader or walking at other points on the roadway . . ."

A similar proposition was affirmed by this Court in the case of *Bennett v. Boney,* 367 Pa. 249, 80 A. 2d 76.

Plaintiff's point No. 5 read as follows: "One suddenly backing a dangerous instrument, such as a heavy loaded truck, from a stopped position without first observing that the backing can be made without injury to another and without warning or sounding the horn is negligent."

To this the Court replied: "As I said before, we are going to submit the question of negligence to you and we will refuse that point."

This also practically told the jury that the proposition stated by counsel was incorrect and that the Judge would later illuminate the proposition to the jury. But he did not.

We have no intention of showing any disrespect to the learned trial judge and it may have been an oversight on his part in the hurry of the trial not to again take up the matters brought to his attention by counsel but the effect of his failure was to deny to the plaintiff what, as stated in *McNees v. Sims,* supra, he was unquestionably entitled to have—a distinct and unqualified affirmance of each of the points, which correctly stated the law.

It appears that just before the accident, a fellow workman had shouted, calling attention to another truck that had partially upset in the vicinity of the mixer; and for that instant the decedent's attention was diverted. Plaintiff's counsel asked the Court to charge: "6. If you find the deceased, Paul Lee Sankey's attention was suddenly drawn to the truck that upset

and he momentarily looked in that direction in response to his attention being suddenly called and turned his back to the stopped truck, this would not necessarily constitute negligence."

And this point was refused. It was not only refused but no explanation whatsoever was given to the jury on this feature of the case, thus leading the jury to believe that if the decedent did, even momentarily, lift his eyes in response to the shout, this constituted the negligence. "in any particular," which would prevent the administrator from recovery. Whereas obviously, this was not true at all.

The decedent was not a pedestrian in the street, having only one concern, namely, his own safety. He was a workman among workmen and he had the right to expect that the truck driver defendant would take cognizance of his presence. In *Peters v. Schroeder*, 290 Pa. 217, this Court said: "The driver was bound to look for the presence of other persons employed on the work and take such reasonable precaution as the circumstances required to avoid injuring them."

Counsel for the defendant says in his brief that the decedent at the time of the accident "was not furthering his duties." Paul Sankey, who was a workman, was taking a drink of water while exposed to a hot July sun. The drinking of water while engaged in arduous physical labor is as much a part of a workman's necessitous duties as wiping the sweat out of his eyes.

Plaintiff's counsel asked the Court to instruct the jury: "7. If you find Paul Lee Sankey was guilty of contributory negligence, it would not bar a recovery if you find the defendant was guilty of reckless and wanton misconduct."

The Court's refusal to so instruct was error.

On his own testimony, James Russell Young, the defendant, was not only grossly negligent but wilfully

so to the point that his conduct, under our decisions, could be characterized as wanton negligence or misconduct. Backing up a truck where, it is known, people are congregated, is conduct as morally reprehensible and legally culpable as pulling the trigger of a shotgun without first ascertaining whether the gun is loaded.

The defendant was thoroughly aware of the fact that men gathered at the drinking place; he knew that men sometimes stood behind the trucks and admitted that he himself had done that very thing for the shade the truck afforded on a hot day. Despite this knowledge he did not descend from his cab to see if any men were in the direct path of the course he knew he was about to take. From his position in the cab it was impossible for him to see what was behind his truck. His vehicle carried what was known as a "cab shield," which had no opening in the rear. But even if the cab shield had had a visual outlet to the rear, and the truck had been equipped with a mirror in the center of the inside of the cab, which it was not, the driver would still have had no vision of the space behind his truck because the tall batches on the body of the truck obstructed all view. An idea of how totally he was cut off from the rear of his truck may be obtained from this part of his own testimony: "Q. Could you see around the left rear corner of your truck to any extent at all? A. No. Q. Could you see the side of the dual wheel of your truck? A. No. Q. Could you see the side of the tailgate of your truck? A. No. Q. Could you see the right rear side of your tailgate? A. No. Q. Could you see the right rear dual wheels? A. No."

Although he had a left and right mirror in the cab they were of no use to him: "Q. Would the right mirror disclose anything to the rear of the truck? A. No. Q. Would your left mirror disclose anything to the rear of the truck? A. Not directly to the rear. It takes

some distance before you can. Q. What about the mirror on the inside of the cab? A. There is no mirror on the inside of my cab."

So far as sight from the cab is concerned, there could have been a prostrate workman or a yawning abyss behind his rear wheels but it did not interest Mr. Young to find out anything about this before starting his engine. This was a Quixotic recklessness against which the law has set up a shield for the protection of mankind. That shield was splintered in the court below.

Without receiving an all-clear signal from anybody, without inquiring of any of the workmen about, Young engaged his clutch and started backward. He said that with his left foot on the running board, his right hand on the wheel, his right foot on the gas and his left hand on the door, he looked over his left shoulder as he moved backward. If he was actually contorted in this fashion, he might just as well have had his head in a hood so far as seeing what was transpiring behind his truck.

He gave no explanation as to why he didn't blow his horn or shout a warning as his juggernaut shot back at a speed estimated by one witness to be 15 miles per hour. To one in the path of an oncoming vehicle, 15 miles per hour may well be regarded a snail's pace, but to one in the rear of a car, having no reason to expect its sudden rear movement, 15 miles per hour, traversing only 15 feet, can be lightning speed. In fact, witness Bowser termed it a "flash".

A defense witness testified that the maximum reverse speed of the truck involved in the accident was 6 miles per hour. The speed was something for the jury to decide under instructions from the Judge, but those instructions were not forthcoming. Furthermore, I agree with plaintiff's counsel that the witness called by the defendant to establish the speed of the

defendant's truck did not qualify to do so since he was not familiar with that particular truck.

The conduct of this defendant, as related by his own lips, clearly takes this case within the rule of *Kasanovich v. George,* 348 Pa. 199, 34 A. 2d 523, where this Court said that wantonness is proved "where the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong."

It was for the jury to decide in this case whether Young's actions were not such as to charge him with a "conscious indifference to the perpetration of wrong," but the jury was denied the opportunity to pass upon that question.

In addition to what has already been said about Young's wanton negligence, there is another horrible circumstance to consider. It appears that as the truck backed up, Paul Sankey was first knocked down, and if the truck had then stopped, Sankey would have escaped with only slight injuries. But witness Daniel J. Lieb testified that when the wheel of the truck passed over the body of the deceased, "the engine seemed to roar loud." His explanation for this unusual volume of noise was: "Evidently the gas was applied to the motor to give it a little additional power."

Did the defendant, upon feeling the obstruction behind his wheels, step on the gas pedal to carry the truck over the obstruction? If so, was it not his duty to first inquire what had fallen under his truck before increasing the power which snuffed out the life of Paul Sankey?

In *Frederick v. Philadelphia Rapid Transit Company,* 337 Pa. 136, 10 A. 2d 576, the motorman of a street car, having been informed that possibly someone had fallen beneath his car, nevertheless started the car

and seriously injured a fallen pedestrian. Justice STERN said in that case: ". . . when the owner or operator is put on guard as to the presence of the trespasser, the latter immediately acquires the right to proper protection under the circumstances." With what greater right was Paul Sankey, who was not a trespasser, entitled to be saved from the wanton negligence of the truck driver who, as an experienced driver, could well have known that the "feel" of the obstruction could have been a human being?

One does not need to charge James Russell Young with involuntary manslaughter in order to find him guilty of wanton negligence. If Young was proceeding at the rate of only 3 miles per hour, as he testified, he could have stopped his truck on a penny; and when he felt the first resistance to the backward movement of his car he should have stopped to inquire. To have proceeded, notwithstanding the warning, as slight as it may have been, was the same as if "a huntsman were to see what appeared to be a human being moving about in a clump of bushes, or were informed that there was a trespasser there, and then, without first ascertaining the latter's exact position, shot indiscriminately into the bushes and wounded him." Justice STERN in *Frederick v. Philadelphia Rapid Transit Co.*, supra.

If that is stating it too strongly, then it is enough to say that when, without making inquiry, without looking, without announcing his intention of starting his truck, and then without seeing where he was going, Young projected his 12,000 pounds lethal weapon into a place where he had every reason to know people gathered, he conducted himself in a wantonly negligent manner which required exculpation by twelve of his fellowmen on that issue before he could be absolved from blame in bringing to an untimely end the life of Paul Lee Sankey. Due to errors committed in the court below, herein noted, that test has not been made.

As I view the evidence and the record in this case, justice dictates a new trial so that a properly instructed jury may pass on the serious matter of the violent extinction of a fellow-citizen. Paul Sankey was sacrificed on the battleground of twentieth century speed. It is not just that for that sacrifice his parents should be deprived of the meager solace of some remuneration for what they have lost.