**PENNSYLVANIA R. R. v. GOLDIE.**

No. 11028.

United States Court of Appeals Sixth Circuit.

Decided May 22, 1950.

Walter M. Meek, Detroit, Mich. (Dyer, Angell, Meck & Batten. Walter M. Meek, A. D. Ruegsegger, Detroit, Mich., on the brief), for appellant.

Wilbur M. Brucker, Detroit, Mich. (Clark, Klein, Brucker & Waples, Wilber M. Brucker, Robert A. Sullivan, Detroit, Mich., on the brief), for appellee.

Before HICKS, Chief Judge, and SIMONS, and MILLER, Circuit Judges.

SIMONS, Circuit Judge.

The Pennsylvania's crack train, the Red Arrow, bound from Detroit to Washington on the early morning of February 18, 1947, left its track while negotiating the Bennington Curve, and its engines, tender and several passenger cars rolled to the bottom of an embankment. The plaintiff Goldie was severely injured, recovered a substantial judgment below and the Pennsylvania appeals. The principal question relates to the cause of the accident. Goldie was Assistant Freight Traffic Manager of the Chesapeake & Ohio Railroad Company and was traveling on a pass. It appears to be conceded that he may not recover unless there is proof of wilful or wanton negligence on the part of the railroad. Whether the record contains such proof is the crux of the case.

The Bennington Curve is in the Allegheny Mountains. There the tracks, four in number, curve sharply to the south. The train was running on track 2 counting from left to right. Its two engines and tender leaped tracks 4 and 5, dragging a number of passenger cars with them, landing about 400 feet east of the point of derailment and about 100 feet north of the roadbed. Goldie was a passenger in one of the Pullman cars which followed the engines to the bottom of the embankment. There was no mark on the track structure indicating dragging equipment or of any obstruction having been on the track. While the complaint charged gross, wilful and wanton negligence not only in the ex-

cessive speed of the train, but also in the defective condition of its equipment, track and roadbed, the plaintiff at the trial relied entirely upon the alleged excessive speed of the train.

The plaintiff's evidence to establish excessive speed consisted mainly of the testimony of two experts, both railroad operating men, who in answer to hypothetical questions said that in their judgment the train must have been going between 65 and 75 miles per hour at the time of the accident, though the conceded safe speed on that curve is 25–30 miles. Their evidence is attacked upon a number of grounds. The appellant urges that the hypothetical questions propounded to both contained assumptions not based upon evidence that the track, roadbed and train equipment just prior to the wreck were in good condition and ignored evidence that it would be impossible to determine their condition from an examination of the wreckage. On this ground the appellant contends the expert testimony does not qualify as substantial evidence of excessive speed and that the court should have granted its motion for directed verdict. The appellant also urges that the plaintiff's expert, Bromley, in giving his opinion, relied upon a consideration of two reports which were not in evidence, namely a report of the Pennsylvania Railroad and a report of the Interstate Commerce Commission, both made after an investigation of the wreck. While this infirmity is not found in the testimony of the second expert, it is contended that Bromley's testimony was so prejudicial that the motion to strike it should have been granted and that for failure to do so the judgment should be reversed and the cause remanded for new trial.

With respect to the assumptions in the hypothetical questions that the track was in good condition, there appears to be substantial evidence upon which such assumptions could reasonably have been made. The track was inspected 30 hours before the accident and was found to be in good condition. Two light engines had, without difficulty, passed over the track about 10 minutes before the wreck. There was evidence of the good condition of the track for one mile immediately west of the point of derailment and there were no marks on any part of the wheels of the engine and tender indicating contact with physical obstruction, and there were no marks on the track indicating such obstruction. As to the assumption that the train and its equipment were in good condition the issue as to whether this is supported by evidence is closer. The air brake equipment was admittedly good. There were no marks on the track structure indicating dragging equipment, and appellant's answer to requests for admissions was that while it was impossible to admit or deny whether the train was in good condition because of the extensive damage after the wreck, that so far as defendant was able to determine it was in good condition. The conductor in charge of the train testified that he knew of nothing wrong with the equipment or train. The engineer of the lead engine did not know of anything that was wrong either on the track, train or equipment that would cause the accident. Nevertheless, his engine "jumped."

We had always assumed that to submit to a jury a choice of probabilities is but to permit them to conjecture or guess, and where the evidence presents no more than such choice it is not substantial. Typical of our decisions are Davlin v. Henry Ford & Son, 6 Cir., 20 F.2d 317; Parker v. Gulf Refining Co., 6 Cir., 80 F.2d 795; O'Mara v. Pennsylvania Railroad Co., 6 Cir., 95 F.2d 762. However, in a series of recent cases the Supreme Court has undertaken to draw a sharper line between the constitutional function of a jury to pass upon issues of fact and the function of the court to determine whether there is substantial evidence to submit such issues to the jury. These cases include Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967; Bailey v. Central Vermont R. Co., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444; Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916. We have been constrained to follow. Highfill v. Louis

ville & Nashville R. Co., 6 Cir., 154 F.2d 874. In the Lavender case, as here, there was substantial evidence that the accident was the result of causes other than the defendant's negligence, but it was held that such evidence became irrelevant upon appeal once there was a reasonable basis in the record for inferring fault to the defendants, and the jury having made that inference the defendant was not free to relitigate the factual dispute in a reviewing court. It would be an undue invasion of the jury's historic function for an appellate court to weigh the conflicting evidence, judge the credibility of witnesses and arrive at a conclusion opposite to the one reached by the jury. "But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." [327 U.S. 645, 66 S.Ct. 744.] Indeed, so consistent has been this recent line of decision that it formed the basis of a study entitled "Recent Trends in Judicial Interpretation in Railroad Cases Under the Federal Employers' Liability Act." Moore, 29 Marquette L.Rev. 73.

It is true that the cases cited are all cases involving the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. We see, however, no difference in principle in differentiating the function of the court from that of the jury between cases under that act and cases otherwise arising in the federal courts involving actions for damages due to negligence. With rules applicable to cases arising under state law and tried in local courts, we have no present concern.

■ One loophole for the application of an older principle was left by Lavender v. Kurn, supra. "Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." So we have given the most careful consideration to the present record in order that we may discover, in evaluating all of the evidence bearing upon the accident, whether in the light of the doctrine now applicable there was substantial evidence of fault on the part of the railroad in the respect alleged, bearing in mind that there is no substantial dispute that 65–75 miles per hour at the point of derailment constituted gross negligence. The train entered the Bennington Curve on a downgrade more than an hour late. There is some evidence that for a brief time, at least, it was on open throttle. The overturning speed at the point of derailment, for the engine was 65.1 miles per hour. The two experts were experienced railroad men highly qualified to draw conclusions. Possible obstructions on the track were clearly negatived by the absence of marks on rails, roadbed or engine wheels. The good condition of the track, so far as evidence was available, was established by the inspection, passage of other engines immediately before the accident and the condition of the rails for a mile west of the point of derailment. The absence of discernible fault in the running equipment was to be derived from the testimony of the conductor and engineer. The assumptions of the hypothetical questions that the track and train were in good condition were warranted. They were assumptions made by witnesses for the defendant and by the defendant itself when in answer to interrogatories after investigation, it stated that so far as it was able to determine the track and train equipment were in good condition. There was no error in submitting the issue of excessive speed upon the conflicting evidence to the jury.

■ With reference to the motion to strike the expert Bromley's testimony on the ground that he had considered reports not in the record, the ruling of the district court was not erroneous. It is true that Bromley, in his direct examination, testified that he had seen the Pennsylvania and Interstate Commerce Commission reports which were not produced, but on redirect examination he clarified his evidence by stating that his conclusions as an expert were derived from the facts of record and nothing else. Bromley was 83 years old

and hard of hearing. The court was evidently of the impression that Bromley may not have fully understood the question in the first place and permitted the interrogation that led to the clarification. The court saw and heard the witness. It was in far better position to ascertain the precise circumstances upon which he depended in giving his conclusion than we are, and so was the jury.

The appellant complains that the medical testimony failed to disclose the probability of future pain and suffering, the plaintiff having made a good recovery from his injuries, and so should have been excluded from the consideration of the jury. We do not regard the court's instruction on this point as error. The plaintiff was left with a permanent deformity of his back and with resulting tiredness or fatigue. We are unable to say that the court was not justified in permitting the jury to consider not only the probability of future physical pain but of mental suffering on the part of a highly placed executive throughout the rest of his life, due to a clearly apparent deformity.

The judgment is affirmed.