## Turek *v.* Pennsylvania Railroad Company, Appellant.

Argued November 19, 1951. Before DREW, C. J., STERN, STEARNE, BELL, LADNER and CHIDSEY, JJ.

reargument refused February 4, 1952.

*Philip Price,* with him *Robert M. Landis* and *Barnes, Dechert, Price, Myers & Clark,* for appellant.

*Joseph Matusow,* for appellee.

OPINION BY MR. CHIEF JUSTICE DREW, January 7, 1952:

Defendant, The Pennsylvania Railroad Company, appeals from the judgment entered on a verdict of $15,-000 in the suit of plaintiff, Antoinette Turek, for personal injuries sustained in the derailment of its train known as the "Red Arrow" on which she was riding as an interstate passenger on a pass containing a release of liability.

Frank Turek, for many years an employe of defendant railroad, was the holder of an annual pass which was valid in a number of eastern states, including Pennsylvania. Also he had obtained a special round-trip pass between Altoona, where he resided, and Detroit, Michigan, for himself and his family. However, after procuring this special pass, Turek found it impossible to accompany his wife and children to Detroit, and they made the trip without him. He came to Pittsburgh from Altoona, met his family on their return from Detroit, and they boarded the "Red Arrow" to proceed to Altoona. At about three-thirty on the morning of February 18, 1947, as the train was negotiating the Bennington Curve, a very sharp curve just west of the Tureks' destination, it left the track, crossed over two westbound tracks and plunged down a steep embankment. The accident resulted in the death of Turek and the severe injury of his wife, the present plaintiff.

In a suit by the administratrix of Turek's estate, under the Survival Act and under the Wrongful Death Statute, this Court affirmed judgments against defendant (361 Pa. 512, 64 A. 2d 779). We there stated that since Turek was an intrastate passenger at the time of the wreck, in that he did not cross nor intend to cross state lines, under the law of this Commonwealth a release in a gratuitous pass was ineffective to relieve defendant railroad from liability where lack of due care was shown. We there reiterated what we stated in *Shafer v. Lacock, Hawthorn & Co.,* 168 Pa. 497, 504, 32 A. 44, that "When the thing which causes the injury is shown . . . as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants that the accident arose from a want of care."

That case has no bearing on the instant one, for here, plaintiff, Turek's widow, admittedly was an interstate passenger, riding on a gratuitous pass containing a release of liability, when she received her personal injuries and she cannot recover without a showing of wilful or wanton misconduct on defendant's part: *Francis v. Southern Pacific Co.,* 333 U. S. 445. Therefore, the sole question here is—Does the present record contain such a showing?

It is set forth in Restatement of Torts §500: "The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him." In *Kasanovich, Admrx., v. George,* 348 Pa. 199, 203, 34 A. 2d 523, Mr. Justice STERN, speaking for this Court, said: "It must

be understood, of course, that wanton misconduct is something different from negligence however gross,— different not merely in degree but in kind, and evincing a different state of mind on the part of the tortfeasor. Negligence consists of inattention or inadvertence, whereas wantonness exists where the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong."

We have examined this record in vain for any evidence upon which a jury properly could have predicated a finding that defendant's engineer, from the facts known to him, should have realized the imminent danger of derailment and injury to the train's passengers and, with a conscious disregard of the consequences of his act, he operated his train and permitted it to be derailed. Plaintiff offered no testimony of a positive nature as to speed. Nor did she offer any evidence that the equipment was defective. She testified that some eighteen or twenty times previous to the accident here involved she had ridden over the Bennington Curve on trains of defendant and that as the "Red Arrow" picked up speed on the downgrade approaching Bennington Curve, the train swayed from side to side, baggage fell and passengers were jostled about. There was also testimony that following the derailment the engines, tenders and cars overturned, went over an embankment and were dispersed for a distance of up to 481 feet from the point where the train left its track. It also appeared that defendant's regulations prescribed a speed of thirty-five miles an hour on the downhill approach to the curve and thirty miles on the curve. This evidence, in the absence of an explanation by defendant, would be ample upon which to base a finding of excessive speed amounting to lack of due care (*Turek, Admrx. v. Pennsylvania R. R. Co.*, 361 Pa. 512, 64 A. 2d

779)—it might even be sufficient to show gross negligence. However, we are convinced that such testimony is wholly inadequate to warrant a finding of speed so excessive as to amount to wilful or wanton misconduct, i.e. to show that defendant's engineer had actual knowledge of plaintiff's peril but nevertheless pursued his tortious speed with utter indifference to the outcome. Especially is this so where, as here, plaintiff's testimony as to speed is most indefinite, while defendant's engineer on the "Red Arrow" stated specifically and unequivocally that he had operated his train at twenty-five miles an hour on the approach to the curve, and that he had reduced the speed to twenty-two miles per hour as the train entered the curve (*Knox v. Phila. & Reading Ry. Co.*, 202 Pa. 504, 507, 52 A. 90) ; and also because of the uncontradicted testimony of defendant's superintendent, Morris, whose qualifications as an expert were conceded by counsel for plaintiff, that because of the great weight of the train and the hilly terrain, the dispersal of the equipment following the derailment was entirely consistent with a speed of but twenty-two miles an hour.

On cross-examination of defendant's superintendent, counsel for plaintiff, over defendant counsel's objection, had the witness read from a table in his possession, not prepared by him or under his direction, that on an eight degree curve (the degree of curvature of the Bennington Curve being eight degrees thirty minutes) the "equilibrium speed" is twenty-four miles an hour, the "comfortable speed" is thirty-four miles an hour, the "safe speed" is forty miles an hour, and the "overturning speed" is sixty-four miles an hour. Counsel for plaintiff, therefore, contends that since the "Red Arrow" overturned on the curve, the jury was justified in drawing an inference that the train was travelling in excess of sixty-four miles an hour when the accident occurred. With this contention we cannot agree, for

the obvious reason that such argument presupposes that the track and the train equipment were in good condition, yet there was no such showing, as was done by plaintiff in *Pennsylvania R. R. v. Goldie*, 182 F. 2d 9, which was another suit growing out of this same wreck. The fact that another train had passed over the curve ten minutes before the wreck does not eliminate the possibility that the "Red Arrow" equipment might have been defective or that the passage of the earlier train might have damaged the track.

It is clear to us that the jury should not have been permitted on the evidence adduced to conjecture a finding of wilful and wanton misconduct on the part of defendant. Therefore, the learned court below erred in overruling defendant's motion for judgment non obstante veredicto.

Judgment reversed and here entered for defendant.

---

DISSENTING OPINION BY MR. JUSTICE HORACE STERN:

Plaintiff testified that as the train proceeded down the hill for about two miles prior to arriving at the curve where the accident happened she observed that it was increasing its speed, and that it continued to do so until the cars began to sway from side to side, baggage fell from the overhead racks, and passengers were jostled against one another. There was also testimony presented on the part of plaintiff that after the derailment the engines and various cars were scattered so far down the track, with one of the engines over the embankment, as to show that the train must have been speeding at an excessive rate around the curve, that the nature of the curve and of the descent was such that the Railroad Company had a 35 miles-per-hour speed limit over the approach to the curve and a 30 miles-per-hour limit over the curve itself, and that the train, traveling on the inside of the curve, jumped a rail elevated to the

height of three and a half inches and crossed over two other tracks before overturning. It seems to me that from all this evidence—which, in the light of the jury's verdict, must be accepted as true—the jury was well warranted in finding, as it did find, that the train was being operated at this extremely dangerous place at a highly excessive rate of speed, and that the speed was the cause of the derailment. Defendant argues that there may have been something wrong with the track itself, but there was no evidence whatever to support such a theory, and we have many times held that it is not necessary for a plaintiff to eliminate every *possible* cause of an accident which the ingenuity of the defendant or counsel may suggest.

Having found, then, that the accident was due to the excessive speed, the jury was then further justified in finding that the engineer was guilty of wanton negligence in operating the train in so flagrant a manner. He had traveled over this curve for many years, he knew the speed limit established by the Company, and he must be assumed to have known that the speed at which he was operating the train created a grave and unreasonable risk of harm to the passengers; he nevertheless disregarded the warnings of caution which his responsibility for the lives of hundreds of passengers should have impressed upon him. Reckless indifference to likely consequences, which constitutes wanton negligence, is a state of mind, and a state of mind must be inferred, as the jury inferred it, from the circumstances. After what, in my opinion, was an accurate charge covering the facts and the law in the case, the jury found for the plaintiff, and I can see no justification for the court now entering judgment for the defendant n.o.v. In *Pennsylvania R. R. v. Goldie*, 182 F. 2d 9, a case arising out of this same accident, the Court of Appeals of the Sixth Circuit affirmed a verdict in favor of a passenger who, like the present plaintiff, was

traveling on a pass. While that decision is, of course, not binding upon this court, I can find no basis for distinguishing it either as to the evidence there presented or the applicable law.

I would affirm the judgment entered in the court below.