Evans *v.* Philadelphia Transportation Company, Appellant.

568

Argued November 13, 1964. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Philip Price,* with him *William J. McKinley, Jr., George J. Miller,* and *Dechert, Price & Rhoads,* for appellant.

*S. Gerald Litvin,* with him *Abraham E. Freedman,* and *Freedman, Borowsky and Lorry,* for appellee.

OPINION BY MR. JUSTICE EAGEN, July 20, 1965:

In the early evening of July 28, 1958, F. J. McFarlane (decedent) entered the Second Street station

of the Market Street subway of the Philadelphia Transportation Company (PTC), in Philadelphia. After paying his fare, decedent entered upon the station platform provided for westbound trains.[1] In some unexplained manner,[2] the decedent fell upon the subway tracks. At the time of the accident, decedent was lying in the space between the rails of the westbound track with "one leg and part of a foot" on one rail. While lying in that position, decedent was struck by a PTC westbound train and sustained very serious personal injuries.

Decedent instituted a trespass action in the Court of Common Pleas No. 2 (heard in Common Pleas No. 3) of Philadelphia County against PTC. Some nine months later and prior to trial, decedent died, his personal representative was substituted as the plaintiff of record, and the complaint in the action was amended to aver that the accident caused decedent's death. After a trial before a court and jury, the jury returned a verdict in favor of decedent's personal representa-

---

[1] PTC's subway is an extension of its Frankford Elevated structure. This Frankford train travels in a southerly direction from Bridge Street upon an elevated platform, and when it reaches the approximate location of Arch Street, an east-west street just north of Market Street, the platform descends on a grade to a street level, and then the train enters the Market Street subway tunnel. The train there, continuing on a downgrade, makes a turn to the right of approximately ninety degrees, straightens out and proceeds on a slight upgrade just prior to entering the Second Street westbound station. It was upon the westbound platform of this station that decedent had entered.

[2] "On the day of the accident [decedent] had worked, had a beer and a half in a tavern, and was not intoxicated when he entered the subway station (372a). His last recollection prior to the accident was paying his fare to the cashier and his next recollection was when he awoke in the hospital (372a). There was no smell of alcohol nor any other sympton of intoxication when he was brought to the hospital immediately after the accident (113a).": Brief for Appellee, p. 2.

tive (appellee), and against PTC in the amount of $93,500. Motions for judgment n.o.v. and a new trial were dismissed. From the judgment entered on the verdict, this appeal was taken.

On this appeal, PTC seeks (a) a judgment n.o.v. or, in the alternative, (b) a new trial.

### Judgment n.o.v.

Since the decedent did not place himself voluntarily on the tracks, he was not a trespasser; however, since he was not invited thereon and his presence was not to be anticipated, the extent of PTC's obligation toward him was no greater than if he were a trespasser: *Frederick v. Philadelphia Rapid Transit Co.*, 337 Pa. 136, 10 A. 2d 576 (1940). The legal obligation to trespassers is the avoidance of wilful *or* wanton misconduct: *Geelen v. Pennsylvania R. R. Co.*, 400 Pa. 240, 161 A. 2d 595 (1960), and *Frederick v. Philadelphia Rapid Transit Co.*, supra. Therefore, the crucial question in the determination of whether or not judgment notwithstanding the verdict should be entered herein is: Was the evidence sufficient to warrant a finding of wanton misconduct on the part of the defendant which was the proximate cause of the accident. It is our conclusion that it was, and that the lower court was correct in submitting the issue to the jury.

It is elementary that in passing upon the sufficiency of the evidence for the purposes of such a motion, we must give the jury winner the benefit of every fact and inference of fact which may be reasonably deduced from the evidence: *Gregorius v. Safeway Steel Scaffolds Company*, 409 Pa. 578, 187 A. 2d 646 (1963).

The only eyewitness to the happening of the accident involved who testified at trial was the operator of the subway train, W. R. Forsythe. He was called

by the appellee to testify on direct examination.[3]   His version of the occurrence, since it was not contradicted or impeached by other evidence, is binding upon the appellee.[4]

Forsythe testified that the train involved consisted of five cars and that, as it rounded the curve coming into the station, it was "coasting" and traveling at a speed of no more than ten miles an hour.   The track area along the station platform was well lighted, and in addition, the headlight on the train illuminated the tracks for a distance of 200 feet ahead.   He specifically stated that he did not realize that there was a human being lying in the tracks until "the last moment" and that it was then too late to stop the train in time to avoid the accident.   If his testimony were limited to this explanation, the plaintiff would have not made out a case.   See, *Zawacki v. Pennsylvania R. R. Co.,* 374 Pa. 89, 97 A. 2d 63 (1953).   However, in another portion of his testimony Forsythe admitted seeing "an object" lying between the rails when the train was still 88 feet distant therefrom, and in still another instance, he stated that he first saw "the object" when the train rounded the curve leading to the station platform, or from a distance of 168 feet away.   In either

---

[3] "The motorman . . . was neither a party nor a person having legal interest in the pending suit, and hence the plaintiffs had no right to call him as if on cross-examination": *Callary v. Easton Transit Co.,* 185 Pa. 176, 178, 39 A. 813 (1898).

[4] *Karcesky v. Laria,* 382 Pa. 227, 114 A. 2d 150 (1955); *Zawacki v. Pennsylvania R. R. Co.,* 374 Pa. 89, 97 A. 2d 63 (1953); and, *Steffenson v. Lehigh Valley Transit Co.,* 361 Pa. 317, 64 A. 2d 785 (1949).   Such a rule applies even where the witness is the adverse party: *Goehring v. McDiarmid,* 289 Pa. 193, 137 A. 187 (1927).   However, such rule is subject to the exception that, where in the witness's testimony there is some intrinsic improbability, such testimony may be rejected, even though the witness is not impeached or contradicted by direct evidence: *Matthews v. Derencin,* 360 Pa. 349, 62 A. 2d 6 (1948).

event, 168 feet or 88 feet, both were points at which the train could have been stopped safely before striking the decedent. The train was traveling at about 10 miles an hour and the evidence established that it could have been stopped within a distance of 24 to 38 feet. It did not so stop and continued on until 65 to 70 feet of the train had passed over the decedent's body. Under such facts, it was for the jury to say whether or not wanton misconduct was present.

Appellant contends that in order for wanton misconduct to exist it was necessary to establish that the train's operator had actual knowledge of the decedent's presence on the tracks for a sufficient period of time before the accident to give him a reasonable opportunity to take means to avoid the accident, and that the evidence is fatally lacking in this respect. As pointed out before, the evidence is clear that the operator saw an unusual object lying in the tracks in the path of the train at a time when it was sufficiently far away to stop and avoid the accident. On the basis thereof, the jury would be warranted in finding that a reasonable man, operating this train, would have been more diligent in trying to ascertain the particular nature of the object which he knew to be within the range of his unchangeable path, and the failure to do so, especially in view of the contiguity of the passenger platform, was a reckless disregard for the safety of anyone who might be there. This, in our opinion, would constitute wilful misconduct.

It is true that in several instances this Court has described wilful misconduct as a reckless disregard for the trespasser's safety after actual knowledge of his peril. See, e.g., *Davies v. Delaware, L. & W. R. R. Co.,* 370 Pa. 180, 87 A. 2d 183 (1952). However, these decisions have all erroneously equated wilful misconduct with wanton misconduct, used the terms interchangeably and ignored the patent difference. Correctly

speaking, wilful misconduct means that the actor desired to bring about the result that followed, or at least that he was aware that it was substantially certain to ensue. This, of course, would necessarily entail actual prior knowledge of the trespasser's peril. Wanton misconduct, on the other hand, "means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences . . . ." Prosser, Torts §33 at 151 (2d ed. 1955).

Other decisions of this Court have recognized that *actual* prior knowledge of the injured person's peril need not be affirmatively established to constitute wanton misconduct. These cases, as well as the Restatement of Torts, clearly indicate that if the actor realizes *or* at least has knowledge of sufficient facts to cause a reasonable man to realize the existing peril for a sufficient period of time beforehand to give him a reasonable opportunity to take means to avoid the accident, then he is guilty of wanton misconduct if he recklessly disregards the existing danger.

Restatement, Torts §500, defines "Reckless Disregard of Safety"[5] to exist if the actor "intentionally does an act or fails to do an act which it is his duty to the other to do, knowing *or having reason to know* of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him." (Emphasis added.)

---

[5] In a special note to this section, it is pointed out that the conduct described therein is often called "wanton or wilful misconduct" in judicial opinions.

Comment *d* thereto states that if the conduct involves a high degree of chance that serious harm will result, that fact, that he knows *or has reason to know* that others are within the range of its effect, is conclusive of his recklessness.

This section of the Restatement is quoted with approval in *Turek v. Pennsylvania R. R. Co.*, 369 Pa. 341, 85 A. 2d 845 (1952),[6] but recovery was denied because there was no evidence from which a finding could have been made that "defendant's engineer, from the facts known to him, *should have realized* the imminent danger . . . ." (Emphasis added.) This case involved a derailment, and there was no positive testimony as to speed, defective equipment or other matters from which the engineer should have been aware of the forthcoming danger.

The above language in *Turek,* supra, is also cited with approval in *Zawacki v. Pennsylvania R. R. Co.,* supra, wherein no recovery was allowed because the facts did not permit an inference that the engineer must have had notice of the plaintiff's peril, distinguishing *Peden v. Baltimore & Ohio R. R. Co.,* infra, factually.

*Bowman v. Pennsylvania R. R.*, 299 Pa. 558, 149 A. 877 (1930), adopts this theory also, but by negative inference. That was a case where a high-speed train collided with the rear end of another train preceding it which had stopped along the track.[7] The Court held that there was no evidence to support a finding of wanton misconduct because there was no evidence to show that a warning light along the track (designed to warn

---

[6] While this case does not involve a "trespasser", the observations as to wanton misconduct are relevant because it was only upon this theory that liability could have been predicated, in view of the fact that plaintiff was present by virtue of a "free pass" which contained the usual release of liability for negligence.

[7] See note 6, supra.

of blockage on the track ahead) was functioning at the time of the accident. The inference was that, if it had been proved that the light was functioning, then to ignore it would have been wanton misconduct, showing a reckless disregard for the safety of those on the track ahead. The Court implied that this would have been the result though there was no *actual knowledge* of the peril (i.e., even though the stopped train itself had not been seen until it was too late to avoid the collision). The crucial point, then, in determining wantonness would seem to be whether or not the actor had sufficient warning of the possibility of peril. And actual knowledge thereof would thus constitute only one manner of apprisal, along with other various means.

*Gray v. Pennsylvania R. R. Co.*, 293 Pa. 28, 141 A. 621 (1928), and *Conn v. Pennsylvania R. R.*, 288 Pa. 494, 136 A. 779 (1927), further add to the reasonableness of this interpretation of the requirement of actual knowledge. In each, the primary concern was whether or not the evidence supported a finding that a "permissive crossing" had been established over the railroad's right of way. And, in *Gray*, supra, it was said that "... no warning was required unless it was shown that the trainmen knew or *should have known* of the presence of the boys on the track . . . ." (Emphasis added.) Thus, the reasonable inference is that the establishment of a permissive crossing is another manner of bringing home to the train's operator the possibility of peril (since a property owner owes no more duty to a gratuitous licensee than he does to a trespasser). To the same effect, see *Koontz v. Baltimore & Ohio R. R. Co.*, 309 Pa. 122, 163 A. 212 (1932).

*Peden v. Baltimore & Ohio R. R. Co.*, 324 Pa. 444, 188 A. 586 (1936), and *Cover v. Hershey Transit Co.*, 290 Pa. 551, 139 A. 266 (1927), offer a different manner of arriving at the same result by allowing the jury to find from the physical facts that, in fact, the train

operators did see the plaintiffs' perils, when their testimony had been that they had not seen the peril until it was "too late". While giving lip service to the oft-stated rule that actual knowledge was requisite, the Court in each case allowed an inference to be drawn that one who looks cannot say that he did not see that which he must have seen.

In *Geelen v. Pennsylvania R. R. Co.*, supra, it was stated that under the facts of the case actual prior knowledge on the part of the railroad engineer was necessary, but that such could be inferred from the existing circumstances.

*Frederick v. Philadelphia Rapid Transit Co.*, supra, is particularly applicable. In that case, the operator of the train and its conductor were told that the plaintiff had fallen beneath the wheels of the train, and, thereafter, both the conductor and the operator made a search to determine whether the plaintiff was still there. Not finding him, they continued on their way, running the train over plaintiff and causing him serious injuries. There, this Court held that it was for the jury to determine whether defendant's employees had been put on notice of plaintiff's peril, and if so, whether they were diligent enough in protecting plaintiff after such notice. As here, the plaintiff was treated as a trespasser, but nonetheless a jury verdict was reinstated in his favor.

Applying the holdings and reasoning of the foregoing authorities to the present case, it is clear that the evidence was sufficient to establish that the motorman was in possession of sufficient facts to put a reasonable man on notice of an impending peril and it was for the jury to say whether or not, having such knowledge, he acted with a reckless disregard for the safety of anyone who might be endangered.

The motion for judgment n.o.v., therefore, was properly overruled.

New Trial

Certain errors in the trial require that a retrial be ordered.

As noted before, the motorman was called as a witness in plaintiff's case, and he was examined fully as to the details of the occurrence. He was not called as a witness for the defense. The court charged the jury that the failure of the defendant to call him as a witness permitted them to draw an inference that his testimony would not be helpful to that side of the case. This was prejudicial and reversible error. Plaintiff cannot control the manner in which the defendant presents his case. The motorman was in court and available for either side. That the defendant chose not to have him restate the circumstances of the occurrence (having done so once as part of plaintiff's case) cannot be the basis for predicating an inference unfavorable to defendant's case. See, *Haas v. Kasnot*, 377 Pa. 440, 105 A. 2d 74 (1954), and *Raffaele v. Andrews*, 197 Pa. Superior Ct. 368, 178 A. 2d 847 (1962).

Appellee argues that the examination of the witness was limited to only certain facts incident to the accident, and hence the failure of the appellant to recall him to testify concerning the additional circumstances incident to the occurrence gave rise to a prejudicial inference, citing *Beers v. Muth*, 395 Pa. 624, 151 A. 2d 465 (1959). The record shows that the witness was asked every possible question concerning the occurrence except at what point he applied the brakes to stop the train. This is not such a "limited" examination as presented in and contemplated by the ruling in *Beers*.

The trial court's instructions to the jury were also not sufficiently clear and definitive in setting forth the defendant's duty in this situation. The court defined both negligence and wanton misconduct at the outset

of his charge, but in no instance did he state that the defendant would be liable *only* for wanton misconduct. The closest he seems to have come is the neutral statement, *"We have heard discussion* that where a man is a trespasser, that the only duty of the defendant is to avoid wilful and wanton negligence." (Emphasis added.) While thereafter defining "wanton negligence", he nowhere states that it is the criterion upon which defendant's liability is to be tested. Furthermore, the issue is additionally confused by repeated references to the defendant's negligence in later portions of the charge. Manifestly, negligence is not at issue in this case, involving the duty owed to a "trespasser". While the evidence could support a finding of wanton misconduct, the result actually reached by the jury is problematical. The defendant is entitled to have his liability determined by proper standards as laid out in the trial judge's charge to the jury: *Kimmel v. Yellow Cab Co.,* 414 Pa. 559, 201 A. 2d 417 (1964), and *Hronis v. Wissinger,* 412 Pa. 434, 194 A. 2d 885 (1963).

One final assignment of error requires discussion. Since the present action was instituted by the decedent during his lifetime, the trial court, relying on our ruling in *Radobersky v. Imperial Volunteer Fire Dept.,* 368 Pa. 235, 81 A. 2d 865 (1951), instructed the jury that the measure of damages recoverable for the economic loss was the present worth of the prospective loss of *gross* earning power. Appellant now urges that *Radobersky* is inconsistent with *Murray v. Philadelphia Transportation Co.,* 359 Pa. 69, 58 A. 2d 323 (1948), and should be reconsidered. While the writer of this opinion and the Chief Justice are in favor of resolving the question now in order to avoid retrial complications, a majority of the Court are of the opinion that the question should not be decided upon the present state of the record. This conclusion is reached because the question was not raised in the court be-

low, nor was the pertinent instruction specifically challenged at trial.

Judgment reversed and new trial ordered.

---

DISSENTING AND CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

Irrespective of whether plaintiff was or was not a trespasser, (1) his legal status was that of a trespasser; and (2) in this status plaintiff could recover only if defendant was guilty of wilful or wanton negligence: *Frederick v. Phila. R. T. Co.*, 337 Pa. 136, 10 A. 2d 576.

I would enter judgment n.o.v. because plaintiff's evidence failed to prove *actual* knowledge on the part of defendant's engineer of the presence of a person on the tracks in time to stop the train, and consequently defendant's conduct did not amount to or constitute wilful or wanton negligence: *Davies v. Delaware, Lackawanna and Western R. R. Co.*, 370 Pa. 180, 184, 87 A. 2d 183, and cases cited therein; *Zawacki v. Pennsylvania Railroad Co.*, 374 Pa. 89, 91, 97 A. 2d 63; *Engle v. Reider*, 366 Pa. 411, 77 A. 2d 621; *Geelen v. Pennsylvania Railroad Co.*, 400 Pa. 240, 161 A. 2d 595; *Kasanovich v. George*, 348 Pa., infra; *Peden v. Baltimore & Ohio Railroad Co.*, 324 Pa., infra.

Justice EAGEN, in the recent case of *Geelen v. Pennsylvania Railroad Company*, 400 Pa., supra, *accurately* defined* wanton negligence (page 248): "... wanton misconduct is substantially different from simple negligence and even gross negligence, not only in degree but in kind. In order to exist it must be found that the engineer, in this case, had *actual* knowledge of the decedent's peril for a sufficient length of time before the accident to give him a reasonable opportunity to stop the train and avoid the accident and, despite this ac-

---

* Several earlier cases had defined it too broadly.

tual prior knowledge, the engineer manifested a reckless disregard of decedent's danger. . . . Kasanovich v. George, 348 Pa. 199, 34 A. 2d 523 (1943); Peden v. Baltimore & Ohio R. R. Co., 324 Pa. 444, 188 Atl. 586 (1936). If [wilful or] wanton misconduct is found to exist, then of course, contributory negligence on the part of the decedent cannot prevent plaintiff's recovery."

If judgment n.o.v. is not entered, I would agree with the majority Opinion that a new trial should be granted.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The majority opinion in this case is a masterpiece of confusion, inconsistency and bad law. It cites decisions which it does not follow, it announces principles from cases which are not found therein, and, on the subject involved, it sends the negligence law of Pennsylvania out into a dark sea of incertitude and tempestuous ambiguity, without a compass, quadrant or lamp.

The majority opinion not only misapprehends the relevant law and misapplies established rules of evidence, but it gives little indication of even comprehending the simple and undisputed facts in the case.

The majority has ordered a new trial in a case which was properly tried and which duly proceeded to a just and final judgment. The Bench, Bar and the public justifiably lament the heavy backlog of untried cases in Philadelphia County. This Court does not ameliorate the situation when it throws back on to the smoldering backlog a gigantic timber which has already been hewn and fashioned into the product of justice. Some two weeks will be required to try this case again, lawyers and judges will be compelled to give all their time to a case which has already been adjudicated; and all parties concerned will be subjected

to renewed tensions, anxiety, and worry—all so extravagantly unnecessary.

It is undisputed and uncontradicted that Wm. R. Forsythe, operator of a subway train for the defendant Philadelphia Transportation Company saw an "object" on the tracks 168 feet ahead of him. It is undisputed and uncontradicted that when Forsythe was 88 feet away from this "object" he recognized the object to be the leg and the foot of a human being, later ascertained to be one Frank J. McFarlane. It is undisputed and uncontradicted that Forsythe's train was "coasting" or running at a speed of only 10 miles per hour, and it was established at the trial that the motorman could have stopped the train within a distance of 24 to 38 feet, and had he done so McFarlane would have been untouched. However, he did not stop until 65 to 70 feet of the train had passed over the prostrate body, mutilating and mangling it to such an extent that McFarlane died from the effects of the injuries. With McFarlane in full view of Forsythe, what was Forsythe's duty? Obviously it was to use reasonable care to avoid striking McFarlane. The jury, under proper instructions from the trial judge, found that Forsythe did not use that care.

Why the new trial then?

The majority opinion says that the trial court's instructions were not "sufficiently clear and definitive in setting forth the defendant's duty in this situation." It is difficult to imagine, in spite of the majority opinion's strictures, what the trial court could have said, in addition to what it did say, in instructing the jury, as will be seen in a moment. The majority cites with approval the decision in *Frederick v. Philadelphia Rapid Transit Company*, 337 Pa. 136, and says that it is "particularly applicable" to the facts in this case. Thus, the *Frederick* case could well have been chart, compass and quadrant for this trial—and the trial court so regarded it.

In the *Frederick* case the plaintiff was run over by a train when the operator of the train had reason to believe the victim was on the tracks. Chief Justice HORACE STERN, speaking for this Court, said: "It *is* wanton negligence, within the meaning of the law, to fail to use ordinary and reasonable care to avoid injury to a trespasser after his presence has been ascertained." (Emphasis in original)

Thus, the criterion of responsibility, after the operator of a train learns of the presence of some person on the track, is to use ordinary and reasonable care to avoid injury—and that is what the trial court below charged in this case.

Judge ULLMAN, the trial judge, went even further, and practically quoted verbatim from the *Frederick* case. Here is the language in the *Frederick* case: "It is not necessary to seek an appropriate appellation for plaintiff's legal status as the result of his accidental fall onto defendant's track. Since he did not place himself there voluntarily, he was not a trespasser. . . . But, as he was not invited, and his appearance was not to be anticipated, the extent of defendant's obligation toward him was no greater than if he *were* a trespasser. Even a trespasser, however, is not a pariah. . . . When the owner or operator is put on guard as to the presence of the trespasser, the latter immediately acquires the right to proper protection under the circumstances. What constitutes sufficient notice of a trespasser's exposure to a situation of peril necessarily depends upon the facts in each instance." (Emphasis in original)

Here is the language used by Judge ULLMAN in charging the jury: "It is not necessary to seek out some appropriate word for plaintiff's legal status as a result of his being on the railroad track. Since there is no evidence to show that he placed himself there voluntarily, of his own will and desire, he was not a tres-

passer. But as he was not invited by the P.T.C. to go onto the tracks, and as his appearance was not to be anticipated by the motorman, the extent of the defendant's obligation to him is no greater than it would be if he were in fact a trespasser. But even a trespasser is not a pariah. . . . When the operator is put on guard as to the presence of the trespasser, that trespasser, in this case McFarlane, immediately acquires the right to proper protection under the circumstances. What constitutes sufficient notice of a trespasser's exposure to a situation of peril necessarily depends upon the facts in every separate case."

How closer could Judge ULLMAN come to the criterion which the majority admits is the proper criterion?

Chief Justice STERN said also in the *Frederick* case, which, it must be repeated, the majority accepts as authority in this case: "As applied to the type of cases of which the present is an example, it is *not* wanton negligence to fail to use care to discover the presence of an unanticipated trespasser, but it *is* wanton negligence, within the meaning of the law, to fail to use ordinary and reasonable care to avoid injury to a trespasser after his presence has been ascertained." (Emphasis in original)

This is what Judge ULLMAN said in the case at bar: "As applied to the kind of case that we have presently before you, it is not—and I underscore the word 'not'— wanton negligence to fail to use due care to discover the presence of an unanticipated trespasser, but it is— and I underscore 'is', it is wanton negligence within the meaning of the law to fail to use ordinary, reasonable care to avoid injury to a trespasser after his presence has been ascertained."

For the majority opinion to cite with approval a certain case and then castigate with disapproval a trial judge who uses that very case, in the very words of the approved decision, is to me an appalling demonstration of appellate absolutism.

But that is not all. Chief Justice STERN said in the *Frederick* case: " 'Wanton negligence,' as distinguished from ordinary negligence, is characterized by a realization on the part of the tortfeasor—or at least what would cause such a realization to a reasonable man—of the probability of injury to another, and by a reckless disregard, nevertheless, of the consequences."

This is what Judge ULLMAN said: "Wanton negligence, as distinguished from ordinary negligence, is characterized by a realization on the part of the person alleged to be at fault, or at least would cause such a realization to be a reasonable man of the probability of injury to another and by a reckless disregard nonetheless of the consequences."

For the majority to approve of the *Frederick* case and say that it is "particularly applicable" to our case here and then complain when the trial judge practically uses a carbon copy of the language in the *Frederick* case is a demonstration of juridical irresponsibility that adds no glory to this Court.

It is to be noted here, in addition, that the majority opinion itself declares that it was for the jury to say whether or not Forsythe, the motorman, "acted with a reckless disregard for the safety of anyone who might be endangered." Yet, although Judge ULLMAN used that very phrase "reckless disregard" in his instruction to the jury, the majority still finds it to be "not sufficiently clear and definitive".

Apparently striving for some reason upon which to pin its strange conclusions, the majority opinion says that, while Judge ULLMAN defined wanton negligence, he "nowhere states that it is the criterion upon which defendant's liability is to be tested." Why would Judge ULLMAN have given a definition of wanton negligence if he did not intend it as an application to the facts in the case at bar? Judge ULLMAN was not speaking for entertainment, he was not delivering an aca-

demic lecture to law students, he was instructing the jury! I repeat what he said: *"As applied to the kind of case that we have presently before you,* it is not— and I underscore the word 'not'—wanton negligence to fail to use due care to discover the presence of an unanticipated trespasser, *but it is—and I underscore 'is',* *it is wanton negligence within the meaning of the law* *to fail to use ordinary, reasonable care to avoid injury* *to trespasser after his presence has been ascertained."* (Emphasis supplied)

How more "clear and definitive" could Judge ULL-MAN be in applying the criterion of liability?

How do you apply the criterion of wanton negligence? You simply inform the jury that, even though the injured person is a trespasser, he is entitled to be protected under the standard of "ordinary and reasonable care to avoid injury."

The majority seems to entertain the idea that there is some kind of care required in wanton negligence cases which is different from the care to be exercised in other cases, that perhaps the trial judge must tell the jury that the defendant must use "wanton care" or some such indescribable thing. The majority opinion in this regard is an enigma and, in the event of a new trial, will convey no information whatsoever to the trial judge as to how and what he is to charge. The vague import of the vague majority opinion seems to be that the judge should tell the jury that the defendant should not exercise wanton negligence, but such an instruction would be like telling the master of a ship he is not to sail east but not indicating whether he should sail north, south or west.

Why does the majority want to be so occult when the law is so clear? The duty of a trial judge, I repeat, is to tell the jury, in a case of this kind, that even if the victim is a trespasser he is still entitled to be protected by the exercise of ordinary and reasonable

care on the part of the operator of the train. If the operator used that type of care, the verdict shall be for the defendant. If he did not, the verdict shall be for the plaintiff. That is the precise rationale of the *Frederick* case which the majority holds up as a lantern but somehow fails to see its light.

Not only does *Frederick* say this, but §336 of the Restatement of Torts proclaims it in even stronger language, namely, "A possessor of land who knows that another is trespassing thereon or from facts known to him should know or believe that another is or may be doing so, is subject to liability for bodily harm thereafter caused to the trespasser by the possessor's failure to carry on his activities upon the land *with reasonable care for the trespasser's safety.*" (Emphasis supplied)

"Reasonable care" is the bell which rings throughout the law of negligence, and it rings in this case, although the majority fails to hear it. *Reasonable care* is the light which shines in the sky of the law of negligence with the brilliance of the aurora borealis but the majority fails to see it. REASONABLE CARE vibrates with electric intensity through all the jurisprudence on negligence but the majority apparently fails to feel it. In fact, so arbitrarily or unconcernedly unaware is the majority of what is taking place here that it startlingly declares that "negligence is not at issue in this case, involving the duty owed to a 'trespasser'". If negligence is not the issue in this lawsuit why doesn't the majority disclose to the parties and the Bar in general its closely-guarded secret as to what *is* the legal problem.

However, in spite of what the majority has said and in spite of what it has failed to say, negligence and nothing else is the issue in this case, and this should be apparent even to a one-month law student.

In *Petrowski v. Philadelphia & R. Ry. Co.*, 263 Pa. 531, a minor trespasser was injured when he fell off

a railroad car due to the negligence of the train crew. Chief Justice VON MOSCHZISKER, speaking for the Court, said: "When a child of tender years is observed upon a railroad car, it is the duty of those in charge to see that they do not start the train until the infant trespasser has alighted therefrom. . . . If this duty is breached, it is not essential to recovery that there be present any element of recklessness or grossness,— proof of what under ordinary circumstances might be termed 'mere negligence' is enough."

Chief Justice VON MOSCHZISKER, as if in anticipatory refutation of the majority opinion's languge in this case, said that when the railroad crew "negligently acts in such a manner as to injure the trespasser, the conduct of the transgressor is viewed in law as 'intentional', or wilful and 'wanton.' " Thus, and this cannot be emphasized too strongly, because the majority seems to miss the distinction, the care required is "ordinary and reasonable care," but the failure to exercise that type of care where trespassers are involved, is characterized "wanton negligence," all of which Judge ULLMAN made very clear to the jury in the instant case.

The Pennsylvania annotations to comment a of §336 of the Restatement, in discussing the *Petrowski* case, said: "The court said further that the terms 'wantonly and intentionally' are used in the sense of 'ordinary negligence,' and that 'the test is neither reckless conduct nor gross negligence but lack of care under the circumstances.' "

"Lack of care under the circumstances"—*that* is the criterion in all negligence cases. To fail to exercise that type of care can be characterized as a "reckless disregard for the safety" of others, but the care always remains "reasonable and ordinary care." What was Forsythe required to do when he saw McFarlane on the track? He was not required to stand on his

head, shout, scream or throw himself off the train. He was required to do what was to be expected of an experienced motorman: use the emergency brakes and bring his train to a stop as quickly as possible, all of which spelled out care under the circumstances. But *this* he failed to do, and, in failing to do this, he showed what Chief Justice STERN so well called in the case of *Kasanovich v. George*, 348 Pa. 199, "wanton misconduct."

In keeping with the rambling looseness of the majority opinion, it is not surprising that it failed to make any reference to the *Kasanovich* case which, of course, is the very cornerstone of jurisprudence on this subject of "wanton negligence." In that case the plaintiff's decedent was walking along a streetcar track facing away from oncoming cars. This Court said that the decedent's carelessness amounted to contributory negligence as a matter of law: "For decedent to have walked alongside the streetcar track and in close proximity to it, with his back to approaching cars, and without making the necessary observations to protect himself, was so clearly negligence on his part which contributed to the happening of the accident that the court was justified in declaring it to be such as a matter of law."

However, in spite of this demonstrated, law-declared contributory negligence, this Court held that the plaintiff could recover if the evidence demonstrated that the motorman who ran down the decedent was guilty of wanton misconduct. Chief Justice STERN put it plainly: "Such contributory negligence would not be a bar if the motorman was guilty of wanton misconduct, that is, if he exhibited a reckless disregard for decedent's safety after observing his perilous position and realizing the danger involved in proceeding at a high rate of speed and without giving warning of his approach."

What this all amounts to is simply this. If the victim of an accident faultily puts himself in a state of danger, someone else may not injure or kill him simply because he is at fault. The operator of the oncoming dangerous instrumentality is required to make an effort (an effort based on reasonable and ordinary care) to avoid the collision, and if he does not do so, and harm results, the operator becomes responsible in damages even though the victim may have been guilty of contributory negligence. Thus wanton negligence or wanton misconduct wipes out the otherwise mortally disabling factor (for the plaintiff) of contributory negligence.

In a word, wanton negligence or wanton misconduct is a cataloguing designation for lawyers and judges, and is not a description of a type of care. Wanton misconduct is simply the failure of the defendant to exercise ordinary care in spite of the assumed contributory negligence of the plaintiff, which, incidentally, does not exist in this case. There is no evidence whatsoever that McFarlane was guilty of contributory negligence as a matter of law. He was, one could almost say conclusively, not even a trespasser. He had paid for his fare as a prospective passenger and was thus legitimately on the defendant's property. It is not known how he fell to the tracks. He could have fainted and fell, he could have been pushed and fell. There could be a score of ways for him to have found himself on the tracks without fault on his part but, once there, and once having been seen by the motorman, the motorman had a duty to avoid running his train over him.

That is what Judge ULLMAN charged. Did Forsythe use the care required of him under the circumstances? And no one reading the record can doubt that he did not. Coming back to the *Frederick* case, especially since the majority holds this out as a lighthouse of di-

rection, we said there that, when the operator of the train has reason to believe that someone is on the track there fastens "upon defendant the duty of thereafter exercising due care for his safety." And that is what Judge ULLMAN charged.

Of course, where the operator of a train does *not* know of the presence of a trespasser then his duty is different. (Restatement, Torts, §336, comment d Pennsylvania Annotations) but that obviously is not this case. It would appear that the majority cannot distinguish between ignorance of the presence of a trespasser and knowledge of his presence.

In *Dumanski v. City of Erie*, 348 Pa. 505, this Court stated the rule which the majority constantly cherishes but which has no application to the facts in the case before us, namely, that where the trespasser's presence is unknown to the landowner (the city of Erie in that case) "its only duty was to refrain from inflicting upon him any wilful or wanton injury." However, this Court added: "Had his presence been known to the City appellee or reasonably should have been known to it, ordinary and reasonable care to avoid injury would have been required."

Here again we have the criterion of "ordinary and reasonable care to avoid injury."

That is all that Forsythe had to exercise, reasonable and ordinary care to bring his train to a stop when he saw the prostrate man on the railroad tracks. And the trial judge so charged, and the jury so obviously understood and it brought in a verdict which is supported by the evidence. And it is an act of sheer appellate arbitrariness to require this case to be retried when the law, as laid down by decisions of this very Court, was followed with painstaking fidelity.

Much is being said today about rights of accused in criminal cases. Extraordinary safeguards and protections are being thrown about persons charged with

crime, and properly so, in order to avoid that an innocent person should be convicted. But the courts should show that same concern over persons who are victims not of crime but of reckless conduct which kills just as permanently as a gunman's bullet. The decision of the majority in this case makes a second class citizen of the plaintiff. Nan Evans, administratrix of the estate of Frank J. McFarlane, is being denied the due process guaranteed to her under the Fourteenth Amendment of the United States Constitution. She is being denied property which a court of law had adjudicated to be hers, in accordance with law.

The motorman Forsythe was called by the plaintiff to testify with regard to the manner in which the accident occurred. Forsythe was an employee of the Philadelphia Transportation Company, the defendant, and, of course, was in court during the trial. The defendant could have called Forsythe as a witness if it chose to do so. It did not choose to do so. The trial judge then, in accordance with the time-honored rule, informed the jury that they had the right to draw an inference, because of the failure of the defendant to call Forsythe as its witness, that had he testified in the company's behalf his testimony would not have been helpful to the company. The majority declares this to have been prejudical and reversible error. Of course, it was not.

The majority cites two cases in assumed support of its ruling. They are utterly inapposite. In *Haas v. Kasnot,* 377 Pa. 440, one of the cases the majority cites, the presumed potential witness, a Louis Mike, was not called by either side, a situation wholly different from the one at bar, where Forsythe did testify for one side. In *Raffaele v. Andrews,* 197 Pa. Superior Ct. 368, the other case cited by the majority, the defendant did not put on any witnesses at all, and, therefore, that situa-

tion was also wholly different from the one before us for consideration.

Not only does the majority opinion cite inapposite cases in this arbitrary ordering of a new trial, but it also presumes an omniscience which finds no confirmation in the rest of the opinion. The majority opinion says: "The record shows that the witness [Forsythe] was asked every possible question concerning the occurrence except at what point he applied the brakes to stop the train."

How does the majority know that the plaintiff asked "every possible question" with one exception? I can think of a dozen questions which plaintiff's counsel could have asked, but which he did not ask for the simple reason that he was thoroughly aware that he was dealing with a hostile witness by whose answers he could be bound. The majority admits that one question was not asked, namely, when did Forsythe apply the brakes to stop the train. There were countless others. Plaintiff's counsel could have asked Forsythe what was the condition of his eyes. He could have asked him how well acquainted he was with the locale where the accident occurred. He could have asked him if he had been drinking alcohol that day. He could have asked him if he had had similar accidents in the past. He could have asked why he didn't apply his brakes as soon as he saw an obstacle on the track.

It is consonant with the rest of its opinion for the majority to arrogate to itself a supreme knowledge as to what was in the mind of plaintiff's counsel and what questions could have been put to Forsythe, but the record does not bear out this infinite capacity for mind-reading on the part of the majority.

The majority opinion cites *Beers v. Muth*, 395 Pa. 624, in assumed buttressing of its position. That case categorically destroys the majority's position. There, the plaintiff called the defendant for cross-examina-

tion and asked him if he was driving the car which was involved in the fatal collision which was the subject of the lawsuit, if he was capable of gauging the comparative speeds of automobiles and how fast he was traveling just before the collision. The defendant did not take the witness stand in his own behalf. We held that it was error on the part of the trial court to fail to charge the jury that it could draw an unfavorable inference from the defendant's refusal to take the witness stand in his own defense. This Court said: "Law is the distillation of common sense as drawn from the experience of mankind. And recorded experience through the centuries reveals that unless there is some obvious reason to establish the contrary, the person who fails to offer an explanation, when he is charged with misconduct, runs the risk of having the world believe that he has no satisfactory explanation to produce. Of course, we know that many a blameless person is accused of misbehavior of one character or another, but it still remains true that unless there exists a palpable reason for sealing one's lips, the world expects speech when the finger is lifted to accuse. We are not here considering the constitutional provision that no person is required to reply to any question which might subject him to criminal prosecution."

In the case at bar the defendant railway company's lawyer could have asked Forsythe many questions in an attempt to mitigate the damaging testimony he had given against the railway company when he was questioned by plaintiff's counsel. Forsythe stated, under examination by plaintiff's counsel, that he saw a man on the track when he was 88 feet away. Yet he did not stop the train before reaching him, indeed, until he had passed over him with slaughtering effects. The company's lawyer could have asked Forsythe if there was a failure of brakes, whether the brakes had been inspected, whether the lighting was such that he could

not distinguish the form of a human being. He could have asked him if he did everything humanly possible to avoid striking the prostrate figure on the tracks. There were innumerable questions defendant's counsel could have put to Forsythe in attempted mitigation of the testimony he had given when questioned by plaintiff's counsel.

The jury had the right to infer from the defendant's failure to call Forsythe as a witness that what he said in his examination by plaintiff's counsel was true, and that he had no modification to offer against that testimony. The majority admits that the plaintiff did not ask the witness at what point he applied the brakes to stop the train. Why didn't the defendant's counsel ask that very pertinent, crucial question? The failure of the defendant to put only that one decisive question was enough to justify the application of the rule under consideration. The only possible inference that can be drawn from the defendant's counsel failure to ask that extremely pivotal crucial question is that he assumed or knew that the answer would undoubtedly have been damaging to the railway company. Defendant's counsel was astute in not asking that question or any other question. Forsythe had already revealed, when questioned by plaintiff's counsel, his ineptness, negligence and lack of care at the time of the accident. Defendant's counsel did not intend to drive further nails into the coffin lid of the defendant's case by asking further questions. Any first year law student would see this fundamental strategy on the part of defendant's counsel. The majority seems to miss it.

But, the law has established rules to circumvent strategy and maneuvering when it aims at concealing the truth. And one of those rules is that a party which fails to put an important witness on the stand takes the chance of an unfavorable inference being drawn against it because of that failure. All this is ABC in

trial by jury, but it seems to escape the majority. For the majority to base an order for a long, expensive new trial on so flimsy and feeble a foundation as the one announced in this reason is to play at sixes and sevens with trial by jury.

The trial of this case began on September 16, 1963, and ended on September 30th. This means that in ordering a new trial two weeks more will be consumed in litigating a controversy already litigated, it will mean adding a mammoth log to the gigantic backlog of untried cases, it will mean the retrial of a case without precise direction as to how the case should be retried, which could mean another appeal, another re-reversal of a verdict, and, therefore another retrial, and another prolonged, protracted drawing out of a legal controversy which has already been decided. If Hamlet lamented over the "law's delays," in 1602, I should like to hear him on the snail's gallop of the law in 1965, with particular asides on the case of *Evans v. Philadelphia Transportation Company!* And it would indeed be engrossing also to hear him comment, in iambic pentameter, on self-assumed monarchical usurpation of unwarranted judicial power, all so evident in this case.

I dissent.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

Section 336 of the Restatement, Torts provides: "A possessor of land who knows that another is trespassing thereon or from facts known to him should know or believe that another is or may be doing so, is subject to liability for bodily harm thereafter caused to the trespasser by the possessor's failure to carry on his activities upon the land with reasonable care for the trespasser's safety."

"Illustration 1. The engineer of the X & Y Railroad Company sees lying upon the track a pile of clothing such as would give a reasonable man cause to suspect that it might contain a human being. Under these circumstances the engineer is not entitled to assume that it is not a human being but is required to keep the engine under control until he is certain that it is not such."

If decedent is to be treated as a trespasser, §336 and the above quoted illustration, applied to the instant case, would raise the following questions: Would a reasonable man in the position of the PTC's driver have suspected that the object on the tracks in the area of the platform was a human being? If so, would a reasonable man have acted as the PTC's driver acted? It seems to me a reasonable jury could answer the first question affirmatively and the second negatively and, therefore, I would affirm the imposition of liability upon the PTC. As is pointed out by the Pennsylvania Annotation to §336 and Eldredge, Tort Liability To Trespassers, 12 Temple L. Q. 32 (1937), Modern Tort Problems 163 (1941), "wilfulness or wantonness" is merely a characterization of the conduct of a possessor who is negligent toward a trespasser of whose presence he is or should be aware.

Moreover, I would not treat decedent as a mere trespasser whose presence defendant has no duty to anticipate. It seems unrealistic to require no greater duty toward passengers or potential passengers invited into the area of the subway platform than is required toward individuals who come onto or into the area of railway tracks uninvited and undesired. The PTC should have a duty to watch out for persons in positions of danger in the platform area. In fact, in most instances it probably acts like it has such a duty.

I dissent.