**Cathy L. HERMAN, Administratrix for the Estate of Lawrence Gourley Herman, Plaintiff,**

v.

**CLEARFIELD COUNTY, PENNSYLVANIA; Clearfield County Prison Board; Warden Dan Ogden; Clearfield County Correction Officer/Prison Guard Raymond Taylor; Jefferson County, Pennsylvania; Drug and Alcohol Advisor Raymond Navarro; Clearfield–Jefferson**

---

Mental Health Mental Retardation Program o/w Clearfield–Jefferson MH/MR; A.J. Himes; Clearfield–Jefferson Mental Health/Mental Retardation Center; Clearfield–Jefferson Community Mental Health Center, Defendants.

Civ. A. No. 91–226J.

United States District Court, W.D. Pennsylvania.

Oct. 12, 1993.

Robert P. Petyak, Ebensburg, PA, Mark B. Frost, Mark B. Frost & Associates, Philadelphia, PA, for plaintiff.

James F. Israel, Bryan B. Campbell, Israel & Wood, Pittsburgh, PA, for defendants.

### OPINION and ORDER

D. BROOKS SMITH, District Judge.

I. *Introduction*

On the afternoon of November 1, 1989, Lawrence Gourley Herman (the "decedent")

committed suicide while incarcerated at the Clearfield County Prison. Plaintiff Cathy L. Herman ("Herman"), Administratrix of the decedent's estate, brought this action on October 31, 1991, alleging that the various defendants acted recklessly and with deliberate indifference toward the well-being of prisoners in their custody. Plaintiff avers that the defendants failed to identify and treat the decedent's obvious suicidal intent, and that the defendant municipality consciously followed a policy or custom of failing to train prison corrections officers in proper methods of detecting suicidal tendencies in prisoners, and proper methods of supervising suicidal prisoners. This gross negligence on the part of defendants allegedly caused and resulted in the deprivation of decedent's life and liberty, and constituted cruel and unusual punishment, in violation of his rights under the Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution, and unspecified laws of the Commonwealth of Pennsylvania. This matter is currently before the Court on defendants' motion for summary judgment.[1]

## II. *Background*

The facts giving rise to this case are not in dispute. Lawrence and Cathy Herman were married in New York state in November 1987, and shortly thereafter moved to Clearfield, Pennsylvania where the decedent worked as a long-haul truck driver. Herman Transcript at 33. Decedent had a long history both of alcohol abuse, and of physically assaulting his wife. In 1980 or 1981, well before the Hermans were married, Cathy obtained court protection against the decedent. By 1989, the decedent was drinking very heavily and neglecting his employment responsibilities. The Hermans' marriage had severely deteriorated, and Cathy Herman obtained two separate protection from abuse orders against her husband prior to

October 1989. *Id.* at 48, 60. On or about October 20, 1989, Cathy Herman separated from her husband and moved in with Bill Davis, who lived on the same street as the Hermans. Herman Deposition at 60, 78.

On October 25, 1989 and again on October 27, 1989, Clearfield Borough Police officers were asked to locate decedent because he had not reported for work. On both occasions police found decedent in his home under the influence of alcohol. After the second incident, Officer Titus of the Clearfield Borough Police contacted Jennifer Himes–Bush, a crisis intervention specialist at the Clearfield–Jefferson Community Mental Health/Mental Retardation Center, requesting that decedent be evaluated for involuntary commitment to a mental health facility because he had made threats against Mr. Davis,[2] and because it would not be safe for him to operate his tractor-trailer rig. Clearfield Borough Police Incident Report dated 10/27/89; Bush Deposition at 18, 20.

During her October 27, 1989 evaluation of the decedent, Ms. Bush noticed that he was experiencing "shakes" or "tremors", symptoms often associated with alcohol withdrawal. Bush Deposition at 26. She also discussed with the decedent whether he had actively considered suicide, "and Mr. Herman definitely said that he had not considered anything like that." *Id.* at 28. Following the evaluation, Ms. Bush concluded that the decedent "had significant drug and alcohol problems and marital problems and emotional stressors and that we should assist him in getting into some type of outpatient drug and alcohol therapy or possibly, depending on future evaluations, maybe even an inpatient drug and alcohol [program]." *Id.* at 32. Ms. Bush then accompanied the decedent to the Clearfield Hospital emergency room where

**1.** By Memorandum Order dated October 19, 1992, plaintiff's federal claims against defendant Raymond Taylor, and state law claims against Jefferson County, Clearfield County, Warden Dan Ogden, and the Clearfield County Prison Board, were dismissed. All remaining claims against defendant Jefferson County, were dismissed by Order dated June 25, 1993. And on August 25, 1993, all plaintiff's claims against defendants Clearfield–Jefferson Mental Health Center, Inc.

and Jennifer A. Himes–Bush were voluntarily dismissed with prejudice.

**2.** Officer Titus communicated in his police report and to Ms. Bush personally that the decedent stated that "he would like to blow Bill Davis' head off." Clearfield Borough Police Incident Report dated 10/25/89; Bush Deposition at 25.

he was prescribed 25 milligrams of Librium to help control delirium tremens.[3] *Id.* at 26.

At approximately 6:00 p.m. on October 31, 1989, the decedent telephoned Clearfield Borough Police Officer Gregory S. Neeper, saying he wanted to talk with a police officer. When Clearfield police officers arrived at decedent's residence, decedent told them that he "was going to get Bill Davis", and "that the police would have to kill him if he" went to Bill Davis' house. Neeper Affidavit at 3. Officer Neeper *tried unsuccessfully to per-suade decedent to voluntarily admit himself to the Clearfield–Jefferson Community Men-tal Health Center.*

At approximately 11:45 p.m. on October 31, 1989, Clearfield Borough Police arrested the decedent after he chased Cathy Herman out of Bill Davis' house with a baseball bat, in violation of a protection from abuse order. The decedent was transported to the Clear-field County Prison, where booking officer Mark Kramer interviewed him while com-pleting a commitment form and a "forensic screen" form. Kramer described the dece-dent as "nervous" and "shaky". Kramer De-position at 12. The decedent answered "No" to the forensic screen questions, "Have you or any family members ever attempted sui-cide" and "Have you recently thought of suicide", Exhibit 8 to Plaintiff's Brief in Op-position to Defendants' Clearfield–Jefferson MH/MR Program and Raymond Navarro's Motion for Summary Judgment, and he ap-peared calm by the end of the interview. Kramer Deposition at 16. Nevertheless, Of-ficer Kramer recommended that the dece-dent be professionally evaluated by Raymond Navarro, the prison's full-time mental health consultant. Based upon Officer Kramer's recommendation, and the decedent's repre-sentation that he did not want to get into a

fight with other inmates and so did not want to be around them, the decedent was placed in an isolation cell. Lombardo Deposition at 26–27.

The decedent slept uneventfully through his first night at the prison and was moni-tored regularly during the morning of No-vember 1, 1989. At approximately 12:30 p.m. on November 1, 1989, the decedent was tak-en to the prison's booking area where he met with defendant Navarro at approximately 1:00 p.m. for a complete forensic consultation. Huber Deposition at 53; Navarro Deposition at 109.

Navarro's interview with the decedent last-ed until approximately 1:30 p.m., at which time Navarro spoke with Jennifer Himes–Bush, the crisis intervention specialist at the Clearfield–Jefferson Community Men-tal Health/Mental Retardation Center who had interviewed the decedent a few days earlier, who "advised they did have contact with [the decedent] there but that there were no suicidal statements made...." Navarro Consultation Findings. Navarro then ar-ranged for the decedent to continue receiving his Librium prescription and for a doctor's visit to continue monitoring for possible de-lirium tremens. Navarro Deposition at 92, 156.

As a result of his interview with the dece-dent, Navarro concluded that he was not suffering from delirium tremens. Navarro noted that the decedent was "angry" that his wife "had moved out and was living with a boyfriend" and that the decedent admitted to having consumed a large quantity of alcohol over the two previous weeks. Navarro De-position at 123, 128–29. The decedent said he was a "nervous wreck" and reported that he had been given "a prescription for tran-quilizers so he 'wouldn't blow his brains out.'"[4] Navarro Consultation Findings.

---

3. Delirium tremens may be defined as:

   delirium caused by cessation or reduction in alcohol consumption, typically in alcoholics with 10 years or more of heavy drinking. Clin-ical manifestations include autonomic hyperac-tivity, such as tachycardia, sweating, and hy-pertension, a course, irregular tremor, and de-lusions, vivid hallucinations, and wild, agitated behavior.

   Dorland's Illustrated Medical Dictionary 441 (27th ed. 1988).

4. The precise language and true meaning of the decedent's statement to Navarro about the rea-son he was taken to Clearfield Hospital and administered tranquilizers is unclear from the record. Plaintiff contends that the decedent stat-ed to Navarro "that he was taken to the Clear-field Hospital where he was given a prescription for tranquilizers so he wouldn't blow his brains out." Brief in Opposition to Clearfield–Jefferson MH/MR Motion for Summary Judgment at 9. The portions of Navarro's deposition transcript where Navarro was questioned about this state-

The decedent denied any suicidal intent, but stated: "between you and me, if I get more time at my hearing on Friday, they'll carry me out of here." Navarro Deposition at 132. In his report, Navarro wrote: "He denied intent to harm himself at this time. He stated he did not know how one would kill himself in jail." Navarro Consultation Findings.

Sometime between 1:30 p.m. and 2:00 p.m., Navarro placed the decedent's name on the prison's "special supervision list" with two asterisks next to the name, indicating that prison guards should give the decedent extra supervision and personal contact. Navarro Deposition at 180. Navarro decided to place the decedent's name on the special supervision list because of the decedent's medical symptoms, and the possibility that the decedent would experience delirium tremens. Navarro Deposition at 163–64. Navarro did not place the decedent's name on a "suicide risk alert" list because following the consultation he did not believe the decedent was imminently suicidal. Navarro Deposition at 34, 158–59.

The decedent was returned to his cell at approximately 2:05 p.m. He was found hanging from the cell bars by a noose made from his blanket at 2:30 p.m. Taylor Deposition at 49. The coroner set his time of death as 2:15 p.m. Clearfield Jefferson MH/MR Brief in Support of Motion for Summary Judgment at 8.

### III. *Discussion*

Federal Rule of Civil Procedure 56(c) requires the entry of summary judgment " . . . if the pleadings, depositions, answers to interrogatories, and admissions on file together

ment are only partially included. Nevertheless, it appears that there was some confusion about the decedent's statement. At page 131 of the Navarro Deposition, a colloquy between plaintiff's attorney, Navarro and Navarro's attorney was recorded as follows:

Plaintiff's Attorney: I thought before you said that, "I was going to blow my brains out," was a suicidal threat.

Defendant's Attorney: That's what I was going to object to before. This indicates on the form, "They thought I was going to blow my brains out," was Herman's report to Navarro about what the police thought.

Plaintiff's Attorney: It says, "Doctor gave me prescription for tranquilizers so I wouldn't."

Plaintiff's Attorney: When you asked him about suicidal intent, what did you ask him?

Navarro: I was talking about at that time. Typically something like, Are you going to kill yourself?

Plaintiff's Attorney: Next sentence.

At page 133, the deposition again centered on Navarro's note about Herman's statement regarding the reason he was administered tranquilizers, but the deposition transcript ends abruptly before the issue is resolved or the deponent's answer finally given:

Plaintiff's Attorney: But you already had the knowledge that he had gone to the hospital before because he said he was going to blow is [sic] brains out.

Defendant's Attorney: Objection.

Plaintiff's Attorney: Did you have that information?

Navarro: That's what he was saying.

Plaintiff's Attorney: That's what he said. And did you have that information—

Defendant's Attorney: I'm going to object. Is that what he said? Why don't you think about that a second. Because we have had testimony that said that's not what he said.

Plaintiff's Attorney: This is what this witness said.

Defendant's Attorney: You are stating something about what Herman said, and I don't know yet that Herman has said that.

Plaintiff's Attorney: If this person wants to change his testimony and say he didn't write this down, that's fine.

Plaintiff's Attorney: Read it over, Mr. Navarro.

Navarro: Which part?

An examination of the handwritten notes Navarro took while interviewing the decedent is more helpful than the deposition transcript. In those notes, Navarro wrote: "Has had contact with mental health last week. AJ Himes. Took him to Clfd [Clearfield] Hospital 'because they thought I was going to blow my brains out.' Dr. gave script [prescription] for tranquilizers 'so I wouldn't.' " Exhibit 10 to Brief in Opposition to Clearfield–Jefferson MH/MR Motion for Summary Judgment. Navarro's notes do not say that the decedent was taken to the Clearfield Hospital because he *was* going to "blow [his] brains out," or even because the decedent told the police that he was going to commit suicide. Rather, these notes, which Navarro recorded contemporaneously as he interviewed the decedent, indicate that Herman told Navarro that the reason he (Herman) was taken to the Clearfield Hospital was that *the Clearfield Police thought* Herman may have been suicidal. Navarro's notation cannot be adduced as evidence that prior to his October 31, 1990 arrest the decedent *was* suicidal and required medical attention, though it is certainly evidence that the Clearfield Police were concerned that he might be suicidal and had him treated at the hospital out of an abundance of caution.

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "[T]he requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). An issue of fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party. *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514; *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir. 1987). In determining whether an issue of material fact does exist, all inferences must be drawn in favor of the non-moving party. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991).

■ Instantly, plaintiff alleges that defendants' evaluation and supervision of the decedent violated his rights under the Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution. However, because plaintiff has neither alleged, nor adduced any facts suggesting an unreasonable search and seizure, her Fourth Amendment Claim will be dismissed with prejudice. *See Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (applicability of Fourth Amendment protections to prison searches "turns on whether 'the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action' ") (quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979)). Because the decedent was a pretrial detainee who had not yet been con-

victed of any criminal offense, the constitutional ban against cruel and unusual punishment did not apply to him, and plaintiff's Eighth Amendment claim will also be dismissed with prejudice. *See Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979); *Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir.1987), *cert. denied* 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988); *Marshall v. Borough of Ambridge*, 798 F.Supp. 1187, 1193 (W.D.Pa. 1992). Finally, plaintiff cannot allege violation of decedent's Fifth Amendment rights by defendants, except in a form redundant of her Fourteenth Amendment claim.

Plaintiff's remaining claims are (1) a claim of deliberate indifference to the decedent's risk of suicide against Raymond Navarro, the Clearfield–Jefferson Mental Health/Mental Retardation Program (the "Program"), Clearfield County, the Clearfield County Prison Board and the prison warden Dan Ogden,[5] (2) a failure to train claim against the warden, prison board and county, together with (3) pendent state claims.

1. *Fourteenth Amendment Claim Based Upon Defendants' Alleged Indifference to the Decedent's Risk of Suicide*

A.

Initially, Navarro and the Program argue that plaintiff has not alleged any federal claims against them. However, plaintiff does incorporate by reference her federal claims against the Clearfield County defendants, and alleges that Navarro and the Program were state actors with respect to the decedent. Defendants also argue that as they were neither employed by the county, nor had custody over the decedent, they are not subject to § 1983 liability. However, as the

---

5. Defendant Warden Dan Ogden is listed in the caption of plaintiff's complaint, and described in paragraph 8 of that pleading as "an individual [who] at all times relevant hereto Warden of the Clearfield County Prison, acting in such capacity as the agent, servant and employee of Defendant, County of Clearfield. He is sued individually and in his official capacity." Plaintiff does not allege that any particular action by Ogden was a proximate cause of Herman's death, but does aver in her first cause of action that Ogden, acting within the scope of his employment, was deliberately indifferent to the decedent's constitutional rights by dint of the prison's "inherently

deficient policy directives and/or administrative procedures involving the detention of prisoners," failure to "provide adequate training" to correction officers, "failing to provide constant observation of suicidal detainees while in custody," and other, similar failures. Because plaintiff is clearly suing defendant Ogden only for actions that he took in his official capacity, her claims against Ogden in his individual capacity will be dismissed with prejudice. Plaintiff's remaining claims against Ogden are discussed with reference to her claims against the "Clearfield County defendants."

United States Supreme Court noted in *West v. Atkins,* 487 U.S. 42, 55, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988), "custodial and supervisory functions are irrelevant to an assessment whether the particular action challenged was performed under color of state law." Whether Navarro was *employed by* the prison to provide psychological services is not dispositive. *Id.* ("It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State").

█ It is undisputed that Navarro worked for the Program in the Clearfield County Prison on a full-time basis, was treated as the *de facto* prison psychologist and practically speaking made final decisions regarding prisoner supervision. He developed, taught and implemented the prison's forensic screening program. There is no genuine factual dispute about Navarro's role within the prison; as in *West,* Navarro was the only qualified person who could provide psychological screening services to pretrial detainees and prisoners. As such, Navarro and the Program were actors "clothed with the authority of state law."

### B.

In order to establish her Fourteenth Amendment claim, plaintiff must adduce facts showing that the defendants violated the decedent's due process rights by means of an official or customary municipal policy of deliberate indifference to the serious medical needs of suicidal pretrial detainees. The phrase "deliberate indifference" was coined by the Supreme Court in *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), to describe a state of mind less than willful but greater than negligent. In one of the very few attempts to provide more than a conclusory definition of deliberate indifference, a panel of the Eleventh Circuit described what it referred to as the "hazy" or "conceptually vague" distinction between deliberate indifference and negligence. *Howell v. Evans,* 922 F.2d 712, 720 n. 7, *vacated,* 931 F.2d 711 (11th Cir.1991). Deliberate indifference, according to *Howell,* requires a knowing action or refusal to take a

necessary course of action, plus the knowledge that the action creates a hazard of serious harm. 922 F.2d at 720–21. *See also Edwards v. Gilbert,* 867 F.2d 1271, 1276 (11th Cir.1989) ("strong likelihood" of harm).

The United States Court of Appeals for the Third Circuit has declined to define "deliberate indifference," *see Colburn v. Upper Darby Twp.,* 838 F.2d 663, 670 (3d Cir.1988), *cert. denied* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989) ("Colburn I"); *Colburn v. Upper Darby Twp.,* 946 F.2d 1017, 1024 (3d Cir.1991) ("Colburn II"), though it is in accord with the prevailing view that deliberate indifference "implies that there must be 'a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur'" and that "the custodial officials 'knew or should have known' of that strong likelihood." *Id.* (citations omitted). By the plain meaning of the adjectives modifying the noun "indifference," it would seem that "deliberate indifference" requires a greater showing of constitutional neglect than does "reckless indifference," which is the standard of liability applicable to individual officers whose actions result in constitutional injuries. However, the Third Circuit Court of Appeals has withheld guidance on that question as well. *See Fagan v. City of Vineland,* No. 92–5481, slip op. at 32 n. 8, 1993 WL 290386 (3d Cir. August 5, 1993), *reh'g granted* 5 F.3d 647 (3d Cir.1993).

█ Thus, to meet her burden, plaintiff must adduce evidence showing that defendants knew or "should have known" of the decedent's suicidal intent, and were either recklessly or intentionally indifferent to that knowledge. *See Colburn II,* 946 F.2d at 1025. "Should have known", in this context, means "something more than a negligent failure to appreciate the risk of suicide presented by the particular detainee, though something less than subjective appreciation of that risk." The Third Circuit has likened this mental state to the constructive knowledge custodians have been found to have in the face of an "obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." *Id.* at n. 1 (citations omitted).

The undisputed facts in the instant matter do not create a genuine issue for trial concerning whether Raymond Navarro, Raymond Taylor, or the other defendants were intentionally or recklessly indifferent to the risk that Herman might commit suicide. The record indicates that Officer Taylor was sufficiently troubled by his interview with the decedent during the initial forensic screen that he cautiously and responsibly referred the decedent to Navarro for a full forensic consultation. During that consultation, Navarro identified "red flags" which alerted him to the possibility that the decedent was harboring suicidal thoughts, but determined according to his professional judgment that these red flags were either "conditional threats" ("*if* I get more time at my hearing on Friday, they will carry me out of here") or attempts by the decedent to manipulate Navarro. Navarro Deposition at 132, 146, 158. Navarro was aware that the decedent had a history of abusive behavior toward his wife, was distressed over her residence with another man, and was at risk for experiencing delirium tremens, but he concluded that the decedent was not imminently or "acutely" suicidal, and his primary concern was over the risk of delirium tremens. Navarro Deposition at 92–99. Nevertheless, because he was sufficiently impressed by these "red flags," and because he was aware that the decedent's condition could change, Navarro placed the decedent's name on the prison's special supervision list and appended two asterisks, indicating that a relatively high level of monitoring was required, albeit a level short of that required for an imminent suicide risk.

Tragically, the decedent slipped through the prison's two levels of screening. However, municipalities are not guarantors against inmates' self-inflicted injuries, *Colburn I*, 838 F.2d at 669, and suicides are not always preceded by telltale signs obvious even to the mental health professional. It would be anomalous to send the instant case to a jury when the Third Circuit declined to do so when faced with facts that on their face are more damning: Clearfield County utilized intake procedures much more likely to identify and monitor potentially suicidal detainees than did Upper Darby Township, the defen-

dant in the *Colburn* cases, whose "booking process ... include[d] no formal physical or mental health screening." *Colburn II*, 946 F.2d at 1023. The decedent in *Colburn* arrived at the jail intoxicated and in possession of a handgun, which the intake officer did not discover. Her wrists were scarred from previous suicide attempts, and the defendant police were aware of her attempted suicide earlier the same day. Finally, the detaining officer in that case had to prevent the decedent from swallowing three Valium pills she had removed from her purse. *Colburn I*, 838 F.2d at 670. No such indicators attended the arrival of the decedent in the case *sub judice*, and defendants' failure to divine the decedent's intent based on the information they were able to elicit did not violate his constitutional right while in custody to be protected even from himself.

The affidavit of plaintiff's expert, Edward Guy, M.D., states that the facts known to Navarro should have caused him to ask for an emergency petition for psychiatric evaluation, establish round-the-clock observation of the decedent, or place the decedent in a multiple occupancy cell, among other available treatment options. Guy Affidavit at 4. At most, these after-the-fact conclusions suggest that Navarro's judgment and subsequent actions were negligent. Proving that state actors "negligent[ly] fail[ed] to recognize the high risk of suicide" does not establish a claim for civil rights violations. *Colburn II*, 946 F.2d at 1025.

Whether Navarro should have been more alarmed after his interview with the decedent, or should have recommended that the prison take more active measures to monitor the decedent, requires a professional judgment over which practitioners may obviously disagree. However, plaintiff's burden requires her to show more than that the municipal defendant simply failed to identify the decedent as suicidal. In order to establish that defendants "should have known" of the "strong likelihood" that the decedent would commit suicide, such that failure to prevent him from acting on his intent would be a violation of his Fourteenth Amendment rights, plaintiff must adduce evidence that the risk was "so obvious that a lay person

would easily recognize the necessity for preventative action". *Id.* (citations omitted).

Plaintiff has introduced evidence showing that two mental health professionals genuinely disagree over the interpretation of the data available to Navarro on November 1, 1989. In his affidavit, Dr. Guy states that after reviewing pertinent material relating to the decedent's suicide, he holds the opinion that the decedent "was at a high risk to commit suicide," that the decedent's "suicide was predictable and preventable [by] measures which were outlined in my report," and that programs developed to treat potentially suicidal inmates were not adequately implemented "which constituted deliberate indifference on the part of [defendants]." Dr. Guy opined that "[f]or the reasons set forth in [his] report, Mr. Navarro was deliberately indifferent to Mr. Herman's needs for protection from self harm." In his April 20, 1993 report to plaintiff's counsel, Dr. Guy stated that the decedent "presented a cluster of signs and symptoms which clearly placed him in a high suicide risk category[.]" This statement was followed by a reiteration of the facts surrounding the decedent's arrest and incarceration, and a list of treatment options available to Navarro and Clearfield County Prison authorities, which in his professional opinion would have protected the decedent. Dr. Guy then concluded that Navarro was "grossly indifferent" to the decedent's needs for not choosing any of these options. He further opined, without first establishing any factual foundation, that the prison's correctional officers had not been adequately trained to treat potentially suicidal detainees, and this "represent[ed] deliberate indifference on the part of the correctional authorities to Mr. Herman's needs and to the needs of mentally ill inmates."

The contradictory opinions of two experts may create a genuine issue of material fact in a malpractice case. But that evidence, without more,[6] will not satisfy a § 1983 plaintiff's

burden with respect to the cognitive aspect of the defendant's alleged "deliberate indifference." "At most, [plaintiff] has raised a difference of medical opinion regarding [the decedent's] treatment. A difference of opinion does not amount to a deliberate indifference to [the decedent's] serious medical needs." *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir.1989).

Perhaps more importantly, Dr. Guy's affidavit and report are not competent evidence that raise a genuine issue of material fact. Dr. Guy's testimony is essentially a review of undisputed facts followed by a long leap to a legal conclusion that defendants' acts or non-acts constituted "deliberate indifference" or "gross indifference." He does not contend that, or explain how, Navarro or prison authorities departed from professionally accepted standards, nor give any reasons for his conclusions. Further, Dr. Guy's conclusions are merely bald statements of a legal standard that federal judges have attempted to define and apply with only varying degrees of clarity and uniformity. It is of course true that Fed.R.Evid. 704 permits expert testimony on ultimate issues, but even that evidentiary principle does not permit experts to define the contours of a legal standard. *See Pond v. Poirier,* 1987 WL 17867 at *6 (D.Mass.1987) (granting municipal defendants' motion to strike expert's affidavit consisting of a recitation of undisputed facts and characterizing defendants' actions as "gross negligence amounting to deliberate indifference").

Because the undisputed facts supporting plaintiff's allegations, including Dr. Guy's affidavit, establish no more than "an error in judgment, an unforeseeable tragic event, a good faith but misinformed professional decision, or mere negligence," *Estate of Bailey by Oare v. County of York,* 768 F.2d 503, 508 (3d Cir.1985), plaintiff cannot establish that the defendants knew or should have known that the decedent was imminently suicidal.

---

6. Had plaintiff been able to supplement her critical expert's report with evidence that the decedent had a known history of suicide attempts, carried prominent scars on his neck or arms resulting from previous suicide attempts, was intoxicated on the morning of his forensic consultation, had seriously threatened suicide, or

had a psychiatric diagnosis of suicidal propensity, and/or with evidence that the defendant prison had a history of suicides and suicide attempts, the question whether a genuine issue of material fact exists as to defendants' knowledge that the decedent was imminently suicidal would be a closer one.

Similarly, she has adduced no evidence showing that the Clearfield County defendants followed a custom or policy causing correctional officers at the prison on November 1, 1989 to treat the decedent with less care and supervision than that to which he was constitutionally entitled.

■ Plaintiff further contends that the Clearfield County defendants failed to provide treatment services required by Pennsylvania law, which failure "constituted deliberate indifference and was a substantial factor in causing the decedent's death." Plaintiff's Brief in Opposition to the Clearfield County Defendants' Motion for Summary Judgment at 6. Plaintiff's claim that the Clearfield County defendants' alleged failure to provide services required by Title 37, Section 95.243 of the Pennsylvania Code "constituted deliberate indifference" is patently erroneous. Violations of state law may be grist for a state law claim, and may be evidence of a constitutional violation, but do not equate to constitutional injuries, for the federal Constitution requires treatment substantially less aggressive than that embodied in regulations promulgated by the Pennsylvania Department of Corrections. *See Rose v. Bartle*, 871 F.2d 331, 347 (3d Cir.1989) ("It is axiomatic that violations of state law alone are insufficient to state a claim for section 1983 relief") (citations omitted).

2. *Fourteenth Amendment Claim Based Upon Defendants' Alleged Failure To Train Prison Officers In Suicide Prevention*

Were the Court to find that the defendants did have actual or constructive knowledge of the decedent's suicidal intent, or followed a custom or policy that insufficiently met the serious medical needs of suicidal detainees, plaintiff would still have to raise a factual dispute over the question whether the municipal custom can be said to have caused Herman's death. In *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court held that there are limited circumstances in which a municipality can be subject to § 1983 liability for its deliberate failure to train its employees, when such failure results in injury to an individual's constitutional rights. In such cases, the municipality's failure to train "amounts to deliberate indifference to the rights of persons within whom the police come into contact." *Id.* at 388, 109 S.Ct. at 1204.

In her brief opposing defendants' motions for summary judgment, plaintiff states that she "is not claiming against [the Clearfield County] defendants that their unconstitutional policy or failure to train caused a violation of decedent's right." Plaintiff's Brief in Opposition to the Clearfield County Defendants' Motion for Summary Judgment at 16. However, plaintiff alleges in her complaint that the Clearfield County defendants' failure to train prison correctional officers in the identification and supervision of suicidal pretrial detainees caused the decedent's constitutional injury. Complaint at ¶ 31(b)–(d), (i), (k). In light of these contradictory representations, the Court will consider the pleadings as the accurate repository of plaintiff's claims, and will accordingly discuss plaintiff's failure to train claims.

In order to establish its claim for failure to train, plaintiff must "(1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and (2) ... demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives." *Colburn II*, 946 F.2d at 1030.

Dissecting the first prong of this requirement, it is clear that the § 1983 plaintiff does not carry his burden if he merely states the obvious—that a pretrial detainee committed suicide—and induces that the prison did not adequately train its personnel because, otherwise, it would have prevented the suicide. Similarly, it is not enough to suggest "that the [municipality's] employees could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury." *Colburn II*, 946 F.2d at 1030. *See also City of Canton v. Harris*, 489 U.S. at 391, 109 S.Ct. at 1206 ("Neither will it suffice to prove that an injury or accident could have been

avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal").

■ Generic claims of inadequate training are not enough; the plaintiff must identify *specific training* that the defendant municipality did not give, *and* must explain how the lack of that training actually "caused" the decedent's suicide. The causation standard requires more of the plaintiff than simply "point[ing] to something the [municipal defendant] 'could have done' to prevent the unfortunate incident." *City of Canton,* 489 U.S. at 392, 109 S.Ct. at 1206. Rather, the alleged failure to train must *itself* have been "closely related to the ultimate injury." *Id.* at 391, 109 S.Ct. at 1206.

■ The second prong that plaintiffs must satisfy in order to maintain a viable failure to train claim requires a showing that the alleged failure to train was part of an official municipal policy of deliberate indifference to the risk that pretrial detainees might successfully commit suicide while in custody. Failure to train *per se* will not subject the municipality to § 1983 liability; the plaintiff must present evidence that the alleged indifference was a conscious choice that "resulted either from a decision officially adopted and promulgated or from a permanent and well-settled practice." *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1059 (3d Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992). Interpreting the Supreme Court's holding in *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that local governments can only be subject to § 1983 liability for an official policy or custom, defined as a "statement, ordinance, regulation, or decision officially adopted and promulgated", *id.* at 694, 98 S.Ct. at 2037, the *Simmons* court determined that what the plaintiff must adduce is "scienter-like evidence of indifference on the part of a particular policymaker or policymakers." *Simmons,* 947 F.2d at 1060–61.

■ Following the *Simmons* court's teaching, plaintiff in the case at bar must show that the decedent's rights were violated as a result of a Clearfield County official policy or custom not to train correctional officers, which policy or custom that was the product of a conscious decision not to act on a known risk of prison suicides despite the availability of alternatives for preventing such suicides. *Id.* at 1064. Plaintiff must also establish that Clearfield County's alleged policy or custom caused the decedent's suicide. *Id.* at 1067.

When prison officials are aware of certain inmates' particular vulnerability to suicide, they have an affirmative "duty not to act with reckless indifference to that vulnerability." *Id.* at 1068 n. 23 (quoting *Colburn I* ). Accordingly, the inquiry with respect to the Clearfield County defendants is whether a jury could conclude that the defendants made an effort to educate Clearfield County Prison correctional officers to the serious medical needs of intoxicated and potentially suicidal pretrial detainees and how to respond to those needs.

The Clearfield County Prison, unlike the City of Philadelphia in *Simmons,* did not at the time of decedent's detention have a history of numerous suicides and suicide attempts. *Cf. Simmons,* 947 F.2d at 1050 (2) suicides during a five year period). In the years prior to the decedent's incarceration, the prison had experienced one suicide and two, or perhaps four, suicide attempts, which in prison settings hardly constitutes a spate. Lombardo Deposition at 151.

Given this relatively unremarkable historical context, there can be little force to any probabilistic argument that defendants responded insufficiently to a known history of suicide attempts at the Clearfield County Prison. In *Simmons,* the defendant municipality had no suicide prevention measures; instantly, the Clearfield County defendants developed, taught and had employed a suicide prevention program involving two levels of screening, daily review of all prisoners, a "special supervision list" and a "suicide risk alert" list, and mechanisms for dealing with detainees identified as imminently suicidal, such as double-bunking and twenty-four hour

monitoring. Lombardo Deposition at 16–19, 54–59, 92, 94.

There is no dispute that the Clearfield County defendants gave some type of training to prison correction officers regarding the detection of suicidal detainees and the appropriate supervisory response. Baughman Deposition at 7, 9, 12; Huber Deposition at 30, 37; Kramer Deposition at 10, 19; Lombardo Deposition at 78, 84–86, 103–104; McCullough Deposition at 15; Taylor Deposition at 10–12, 14. It appears from the record that this training was done at different times, usually informally at shift change meetings and through one-on-one discussions with Navarro, but sometimes semi-formally through the use of film presentations. *Id.* These facts preclude any claim that the Clearfield County defendants consciously followed a course of no action in response to the serious medical needs of potentially suicidal pretrial detainees. Defendants' motions for summary judgment are accordingly granted, and plaintiff's failure to train claims will be dismissed with prejudice.

3. *State Law Claims*

Plaintiff's pendent state law claims must be dismissed because Pennsylvania's Political Subdivision Tort Claims Act (PSTCA), 42 Pa.C.S. § 8541 *et seq.,* does not include personal injury to incarcerated prisoners among the eight enumerated statutory exceptions to the common law immunity of municipalities and their employees. *See* 42 Pa.C.S. §§ 8542(b), 8545. While 42 Pa.C.S. § 8550 removes immunity from individual defendants who act criminally, or with actual malice or willfulness, that section does not remove the immunity of a county or prison board even if an individual defendant acted willfully. *King v. Breach,* 115 Pa.Cmwlth. 355, 540 A.2d 976, 979 (1988). In any event, plaintiff does not allege that any individual defendant acted with actual malice or committed willful misconduct, defined even prior to the PSTCA in *Evans v. Philadelphia Transportation Co.,* 418 Pa. 567, 573, 212 A.2d 440, 443 (1965) as action taken either with the desire to bring about a particular result or with the awareness that the result which followed was substantially certain to ensue. Nowhere in the amended complaint

is it alleged that any defendant intended to cause Herman's death or took action with substantial certainty that Herman would, in fact, hang himself.

IV. *Conclusion*

For the foregoing reasons, defendants' motions for summary judgment (Dockets No. 27 and 31) will be granted, and plaintiff's complaint dismissed with prejudice. An appropriate order follows.

*ORDER*

Consistent with the foregoing opinion, the motions for summary judgment presented by the Clearfield County defendants (Docket No. 27) and the Clearfield/Jefferson Mental Health defendants (Docket No. 31) are hereby granted. Plaintiff Cathy Herman's complaint is hereby dismissed with prejudice.

The Clerk shall mark this case CLOSED.